Raph Graybill
**GRAYBILL LAW FIRM, PC**
300 4th Street North
P.O. Box 3586
Great Falls, Montana 59403
rgraybill@silverstatelaw.net
ph. (406) 452-8566

Jonathan P. Hawley
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
jhawley@elias.law
ph. (206) 656-0179

Aria C. Branch*
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue, Suite 400
Washington, D.C. 20001
abranch@elias.law
ph. (202) 968-4490

*Attorneys for Plaintiffs*

*\*Pro hac vice application forthcoming*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| MONTANA PUBLIC INTEREST RESEARCH GROUP; MONTANA FEDERATION OF PUBLIC EMPLOYEES, <br><br> Plaintiffs, <br><br> vs. <br><br> CHRISTI JACOBSEN, in her official capacity as Montana Secretary of State; AUSTIN KNUDSEN, in his official capacity as Montana Attorney General; CHRIS GALLUS, in his official capacity as Montana Commissioner of Political Practices, <br><br> Defendants. | CV _____ <br><br><br><br> COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

1.    "[I]t is beyond cavil that voting is of the most fundamental significance under our constitutional structure." *Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1186 (9th Cir. 2021) (cleaned up) (quoting *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)). In recent years, however, political officials in Montana have increasingly erected barriers to the franchise—efforts that have been repeatedly rejected by the judiciary as unconstitutional. *See generally, e.g.*, *W. Native Voice v. Stapleton*, No. DV 20-0377, 2020 WL 8970685 (Mont. Dist. Ct. Sept. 25, 2020) (concluding that Ballot Interference and Protection Act violated Montana Constitution); *Mont. Democratic Party v. Jacobsen*, No. DV 21-0451, 2022 WL 16735253 (Mont. Dist. Ct. Sept. 30, 2022) (enjoining multiple provisions of election code under Montana Constitution), *appeal docketed*, No. DA 22-0667 (Mont. Nov. 22, 2022).

2.    The latest salvo against the franchise was signed into law on May 22, 2023. House Bill 892 ("HB892") amended the voting limitations codified at section 13-35-210 of the Montana Code. Although its ostensible purpose was simply to restate existing bans on double voting (already unlawful under state and federal law), HB892 actually goes much further, pairing vague new voter-registration requirements with draconian criminal penalties.

3.    Specifically, HB892 provides that "[a] person or elector may not purposefully remain registered to vote in more than one place in this state or

another state any time, unless related to involvement in special district elections," Mont. Code Ann. § 13-35-210(5), but the phrase "purposefully remain registered" is neither defined nor explained, and it is unclear whether voters must affirmatively cancel existing registrations and confirm those cancellations to avoid potential liability. HB892 further requires that "[a] person or elector previously registered to vote in another county or another state shall provide the previous registration information on the Montana voter registration application," *id.*, but the scope of the mandated information and the mindset required for violations are not clarified. Anyone who violates these opaque provisions "shall, on conviction, be fined up to $5,000, be imprisoned for up to 18 months, or both," *id.* § 13-35-210(6)—meaning that violations of HB892 can constitute felonies under Montana law.

4.      HB892's reach far exceeds its stated (and legitimate) purpose of prohibiting double voting. It criminalizes both the act of maintaining multiple voter registrations and the failure to include prior-registration information on applications, even if voters and registrants have no intention of actually voting in more than one place—and even if they never do.

5.      By employing vague language and unclear standards in a criminal statute—one that implicates the fundamental right to vote, no less—HB892 violates the U.S. Constitution's guarantee of due process. By exceeding its legitimate aim of prohibiting double voting and punishing protected political

3

expression, HB892 further violates the First Amendment. And by burdening the franchise, both directly and by chilling the right to vote through the imposition of onerous criminal penalties, HB892 separately violates the First and Fourteenth Amendments.

6.      Injunctive relief from this Court is needed to ensure that Montanans can freely exercise their fundamental constitutional rights during the 2024 election cycle—and beyond.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 42 U.S.C. §§ 1983 and 1988 and 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1357.

8.      This Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

9.      Venue is proper under 28 U.S.C. § 1391(b) because "a substantial part of the events or omissions giving rise to the claim occurred" in this district.

## PARTIES

10.     Plaintiff Montana Public Interest Group ("MontPIRG") is a student-directed, nonpartisan membership organization dedicated to effecting tangible, positive change by educating and empowering the next generation of civic leaders. In the spring of 2023, MontPIRG had roughly 5,200 members. For four decades, it has focused on registering young voters, giving them the tools to make their voices

heard and working to eliminate barriers between young people and the ballot box. MontPIRG has worked to ensure access to same-day voter registration, supported the passage of the state's Motor Voter Law, and led robust voter-registration campaigns on Montana campuses. Even at the height of the COVID-19 pandemic, MontPIRG continued its efforts to empower young voters: In 2020, MontPIRG volunteers and interns registered 5,612 voters across the state; made 73,323 get-out-the-vote calls; and collected 1,103 "Why I Am Voting" pledges from students at the University of Montana in Missoula and Montana State University in Bozeman.

11.    Many of MontPIRG's members and constituents are young, highly transient voters. Some recently turned 18 years old—including in states with automatic voter-registration systems—before moving to Montana to attend college. These students intend to vote in the next election, but might not know *where* they plan to vote because of uncertainty about where they will be residing. The ambiguities of what they need to do to comply with HB892 and avoid potentially severe criminal penalties will chill them from registering and voting in Montana.

12.    HB892's chilling effects will also frustrate MontPIRG's organizational mission of registering young Montana voters and encouraging robust participation in the political process. MontPIRG must now inform individuals about the consequences of HB892's new restrictions, retooling training

and informational materials and diverting time and resources away from its other projects, including environmental protection and consumer and renter rights. Given HB892's vagueness and overbreadth, MontPIRG's task is particular daunting: educating voters about criminal provisions that could be enforced in any number of ways and are triggered by a voter's very attempt to engage in the political process. Indeed, MontPIRG is likely to find itself *undermining* its very mission as it warns potential voters that HB892's broad language could be read and enforced to criminalize any number of innocent actions (or inactions) they might take.

13.    Moreover, MontPIRG's staff and volunteers who undertake voter-registration activities are also at risk of criminal prosecution through the enforcement of HB892, since anyone who aids or abets the violation of an election law "is also guilty of a violation." Mont. Code Ann. § 13-35-105; *see also id.* § 45-2-302.

14.    Plaintiff Montana Federation of Public Employees ("MFPE") is Montana's largest union, representing tens of thousands of working Montanans. MFPE members are demographically, geographically, and politically diverse: They are young, old, retirees, active workers, Montanans of color, men and women, Republicans, Democrats, Libertarians, Independents, and Montanans who are members of the disability community.

15.    MFPE is politically active and encourages its members to register and vote. Traditionally, over 85% of its members are registered. As a result of HB892, MFPE members who have moved, either to or within Montana, might be subject to the criminal penalties imposed by the law's overbroad new restrictions. HB892's vague and ambiguous terms will also chill MFPE's members from registering for the first time in Montana or updating their registrations.

16.    MFPE's members write, amend, and vote to adopt its legislative program, which includes opposition to legislation that denies or impedes any citizen's right to register, vote, and participate in the democratic process. The protection of its members' ability to vote and remain civically engaged is thus germane to MFPE's organizational purpose, which will be further frustrated by enforcement of HB892. MFPE will have to divert and expend resources to educate its members about the consequences of HB892 and ensure they are able to register and vote in Montana. And, like MontPIRG, MFPE is put in the impossible position of warning its members about risks of criminal prosecution that are far from clear.

17.    Defendant Christi Jacobsen (the "Secretary") is the Montana Secretary of State and is sued in her official capacity. She serves as the state's "chief election officer" and is responsible for maintaining "uniformity in the application, operation, and interpretation of the election laws," *id.* § 13-1-201, including HB892.

18.    Defendant Austin Knudsen is the Montana Attorney General and is sued in his official capacity. Among his duties are "exercise[ing] supervisory powers over county attorneys," including "order[ing] or direct[ing]" county attorneys to "promptly institute and diligently prosecute in the proper court and in the name of the state of Montana any criminal or civil action," and "giv[ing] an opinion . . . upon any question of law relating to [state or local] offices." *Id.* § 2-15-501. These duties encompass the enforcement of HB892.

19.    Defendant Chris Gallus is the Montana Commissioner of Political Practices and is sued in his official capacity. He "is responsible for investigating all of the alleged violations of the election laws . . . and in conjunction with the county attorneys is responsible for enforcing these election laws," *id.* § 13-37-111, including HB892.

## LEGAL AND FACTUAL BACKGROUND

### Legislative History and Enactment of HB892

20.    As articulated by its sponsor to the House State Administration Committee, the purpose of HB892 was seemingly uncontroversial: to "clarify what double voting means in Montana law, and that voting in Montana and another state is defined as the same election." Ostensibly spurred by a "recent court ruling" that allowed a voter to cast ballots in both Arizona and Colorado during the same midterm election, HB892's sponsor explained that "[t]he bill addresses the current

vagueness in our statute and attached consequences for breaking our election laws."

21.    HB892 does indeed rephrase and augment Montana's previous ban on double voting, *compare* Mont. Code Ann. § 13-35-210(1) (2021) ("No person may vote more than once at an election."), *with id.* § 13-35-210(2), (4) (2023) ("An elector may not vote more than once at an election. . . . A person or elector may not vote in this state more than once at any election held in this state or vote in both this state and another state or territory in the same or equivalent elections, except in a special district election in which a person or elector is entitled to vote."), and Plaintiffs do not challenge these legitimate provisions. But the law also goes much further, creating vague, overbroad new restrictions that implicate other facets of the franchise.

22.    The legislative process yielded numerous concerns with HB892's vague language and serious criminal penalties. At the hearing of the House State Administration Committee, one legislator noted that if someone neglected to fill out the prior-registration section of the voter-registration application, "they'd be looking at 18 months in prison and a $5,000 fine"—a concern that went unaddressed.

23.    At a hearing of the Senate State Administration Committee, another legislator, in response to the Secretary's designee's definition of what would

constitute "purposefully" maintaining multiple registrations, expressed her concern with the bill's vagueness: "I think you could interpret this any way you want . . . . I am not comfortable with that interpretation. I mean, that interpretation, what hangs in the balance is jail time."

24.     When asked by a legislator whether the prior-registration disclosure requirement would "increase the burden to vote on the voter" or "increase the burden on the clerk's office, or both," the representative from the Montana Association of Clerks and Recorders stated that she shared that concern, noting that it was unclear whether clerks would have to refuse registrations if that information were missing and explaining, "I'm not sure what the intent here is."

25.     Throughout the process, during hearings and on the floor, legislators noted that HB892 did not actually allay its stated concern with double voting and was effectively redundant given the safeguards already contained in Montana's election code—in particular, that absentee voters must already affirm that they only voted once in a given election and that the Montana voter-registration application already requires affirmation to the truth of the registrant's information under penalty of perjury.

26.     As one legislator concluded on the House floor, HB892 "takes what was a very simple state statute and straightforward—no person may vote who is not entitled to vote, boom, plain and simple, and may not vote in more than one

election—and then [] added all these other additional subsections, many of which are already addressed" by existing Montana law and practice.

27.    Similarly, during Senate debate, another legislator objected that "[w]e have, in Montana, very safe, secure elections, but this bill practically implies otherwise." She noted that "[i]n all of the history of Montana's elections and voting, there have been only two people that have been found actually guilty in spite of all the allegations that have been made. Only two people in the whole history. We have safe, secure elections. This bill is not needed."

28.    Despite these criticisms and objections, HB892 passed the House and Senate with its onerous new restrictions intact and was signed into law on May 22, 2023.

## Vagueness

29.    HB892 fails to provide sufficient notice as to what it requires of both current Montana voters *and* voter-registration applicants, forcing them to risk severe criminal penalties simply by undertaking their basic right to the franchise.

30.    HB892 prohibits "purposefully remain[ing] registered to vote in more than one place." Mont. Code Ann. § 13-35-210(5). These 10 words, though relatively brief, are rife with confusion and ambiguity.

31.    It is unclear what it means to "*purposefully* remain registered," and whether, for example, a voter who *knowingly* remains registered in multiple

jurisdictions—but actively opts not to deregister from any of them, despite lacking an intention to actually vote elsewhere—also *purposefully* remains registered. Nor is it clear whether a voter who only suspects that they might have been previously registered elsewhere—for example, because they came to Montana from one of many states with automatic voter registration, *see Automatic Voter Registration*, Nat'l Conf. of State Legislatures, https://www.ncsl.org/elections-and-campaigns/automatic-voter-registration (Aug. 31, 2023) (compiling state statutes)—would be at risk of prosecution if they are willfully uncertain of these additional registrations.

32.    Moreover, what it means to "*remain registered*" is ambiguous, and it is unclear whether voters must notify election officials in other jurisdictions and take affirmative action to deregister (and then confirm deregistration) before submitting registration applications in Montana. Nor is it clear if voters must investigate whether they need to affirmatively deregister at previous addresses in other jurisdictions or whether prior registrations are likely to be automatically cancelled if they move or register elsewhere.

33.    Finally, it is unclear at what point in time—and to whom—criminal liability attaches. For example, are college students from Montana who are matriculating in other states and have lawfully registered in those other jurisdictions criminally liable simply by returning to Montana for a holiday break

with multiple registrations in hand? It is further unclear whether current Montana voters with multiple registrations fall within the scope of this prohibition; given the criminal penalties for violations of the statute, this lack of clarity presents constitutional infirmities even broader than the due process clause. *See, e.g.*, *Lynce v. Mathis*, 519 U.S. 433, 441 (1997) (law that is "retrospective" and "alter[s] the definition of criminal conduct or increas[es] the punishment for the crime" violates ex post facto prohibition).

34.    HB892's requirement that voters provide "previous registration information" on their voter-registration applications is also vague. It is unclear, for example, whether the previous sentence's "purposefully" mens rea requirement extends to this offense as well—meaning that it is possible that a registrant could be imprisoned even for inadvertently neglecting to complete that section of the application, or for forgetting about prior registrations and failing to include them.

35.    Moreover, the statute fails to specify whether a voter must list only last-in-time registrations or their entire voting history—including inactive registrations.

36.    In sum, the scope of criminal liability is uncertain based on the plain text of the statute, and the stakes for honest mistakes are high—the penalty for noncompliance is up to 18 months in prison. The State has not provided (and, indeed, cannot provide) any clarification to salvage HB892's fatal vagueness.

**Overbreadth**

37.    Despite its ostensibly limited purpose of clarifying Montana's ban on double voting, HB892 goes much further, criminalizing other voting-related activities and inhibiting protected political expression.

38.    "While double voting is surely illegal, having two open voter registrations is a different issue entirely." *Common Cause Ind. v. Lawson*, 937 F.3d 944, 960 (7th Cir. 2019). Indeed, "[i]n the over-whelming majority of states, it is not illegal to be registered to vote in two places." *Id.*; *see also Double Voting*, Nat'l Conf. of State Legislatures, https://www.ncsl.org/elections-and-campaigns/double-voting (Oct. 25, 2022) (compiling state statutes).

39.    As the Seventh Circuit has explained, there are myriad reasons why maintaining a prior registration might be needed to safeguard a voter's ability to cast a ballot, "[e]specially in states that have an early registration deadline." *Common Cause Ind.*, 937 F.3d at 960. As just one example, "[e]very year millions of Americans go off to college in August. Some drop out by November, for academic, financial, or other reasons, and land back on their parents' doorsteps. They will *vote* in only one place, even if they have open registrations in two." *Id.*

40.    Notwithstanding that some voters might have a justifiable need for multiple registrations—especially young and transient voters, *see id.*—HB892 does not merely prohibit the practice, it *criminalizes* it. A Montanan who violates the

multiple-registration prohibition "shall, on conviction, be fined up to $5,000, be imprisoned for up to 18 months, or both," Mont. Code Ann. § 13-35-210(6)—felony criminal penalties under state law, *see id.* § 45-2-101 (defining "[f]elony" as "an offense in which the sentence imposed upon conviction is death or imprisonment in a state prison for a term exceeding 1 year"). This criminal liability attaches even if a registrant has no intention of double voting.

41.    HB892's heavy-handed criminal penalties extend not only to multiple registrations, but to the simple act of failing to provide prior-registration information on a voter-registration application—whether intentionally or not, and regardless of whether a registrant intends to vote more than once at an election.

42.    Furthermore, the risk of criminal prosecution imposed by HB892 attaches not only to the voters who are now required to register under these vague, onerous restrictions, but also to individuals—like MontPIRG's volunteers and staff—who help them register. *See id.* § 13-35-105 (prohibiting aiding and abetting violations of election code).

43.    Far beyond the mere prevention of double voting, HB892 will chill political expression in Montana by making it riskier for individuals to register to vote and, consequently, costlier for organizations to promote voter engagement. Some potential voters will forgo registering in Montana to avoid sacrificing a registration in another jurisdiction that might also be needed. Others will be

deterred from registering because of the onerous criminal penalties now attached to the voter-registration process—burdens made all the more intolerable by the failure of HB892 to clearly articulate what is and is not unlawful conduct.

### Right to Vote

44.    Even setting aside the statute's unconstitutional vagueness and overbreadth, HB892 places unjustified and unlawful burdens on the right to vote.

45.    Chilling Montanans from registering is not the only manner in which HB892 might cause disenfranchisement. Because the statute includes felony criminal penalties, a Montanan who is convicted and incarcerated for remaining registered in more than one place or failing to provide prior-registration information on an application might be denied the right to vote as a matter of law. *See* Mont. Code Ann. § 13-1-111(2) ("A person convicted of a felony does not have the right to vote while the person is serving a sentence in a penal institution.").

46.    Notably, neither HB892's prohibition on multiple registrations nor its prior-registration disclosure requirement is justified by or tailored to any legitimate state interests. Montana's election code does not mandate a single voter registration as a qualification to cast a ballot or even a requirement to register. *See id.* § 13-1-111 (voter qualifications); *id.* § 13-1-112 (rules for determining voter's residence); *id.* § 13-2-110 (requirements for voter-registration applications); *id.* § 13-2-402 (reasons for voter-registration cancellation); *see also Crawford v. Marion Cnty.*

*Election Bd.*, 553 U.S. 181, 189 (2008) (plurality opinion) ("[E]ven rational restrictions on the right to vote are invidious if they are unrelated to voter qualifications.").

47.    Nor are these new limitations "evenhanded restrictions that protect the integrity and reliability of the electoral process itself." *Crawford*, 553 U.S. at 189–90 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 n.9 (1983)). In particular, HB892's onerous new provisions do not serve "the interest in deterring and detecting voter fraud," *id.* at 191, because "vot[ing] more than once at an election" is otherwise proscribed by HB892, Mont. Code Ann. § 13-35-210, and was already unlawful prior to the new law's enactment, *see id.* § 13-35-210(1) (2021) ("No person may vote more than once at an election."); *see also* 52 U.S.C. § 10307(e) (already criminalizing "vot[ing] more than once" in presidential and congressional elections).

48.    Even if these new restrictions served legitimate interests, the ends do not justify the means. The imposition of severe criminal penalties—*even for neglecting to complete a section on the voter-registration application*—is not justified and not tailored, narrowly or otherwise, to the interests that purportedly underpin HB892.

## CAUSES OF ACTION

### COUNT I
### Fourteenth Amendment to the U.S. Constitution; 42 U.S.C. § 1983
### (Vagueness)

49.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this complaint as though fully set forth herein.

50.    A law is unconstitutionally vague when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Butcher v. Knudsen*, 38 F.4th 1163, 1169 (9th Cir. 2022) (quoting *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)); *see also Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined.").

51.    "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Village of Hoffman Estates v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). In particular, "[i]f a statute subjects transgressors to criminal penalties, . . . vagueness review is even more exacting." *Forbes v. Napolitano*, 236 F.3d 1009, 1011 (9th Cir. 2000).

52.    Vague statutes are especially objectionable when they "abut upon sensitive areas of basic First Amendment freedoms," *Baggett v. Bullitt*, 377 U.S.

360, 372 (1964)—including the right to vote, *see Ariz. Democratic Party*, 18 F.4th at 1186–87 (First Amendment protects against unjustified burdens on right to vote).

53.    Here, HB892 criminalizes the act of "purposefully remain[ing] registered to vote in more than one place" and requires registrants to "provide [] previous registration information on the Montana voter registration application." Mont. Code Ann. § 13-35-210(5). But the law does not define what it means to "purposefully remain registered" or what affirmative steps must be taken to avoid the threat of severe criminal penalties, nor does it ascribe a mens rea requirement to the prior-registration disclosure requirement or clarify the extent of the information registrants must include on an application.

54.    HB892 creates confusion for Montanans of ordinary intelligence, leaving them guessing how to avoid significant criminal penalties and consequently chilling the fundamental right to vote. The statute therefore violates the U.S. Constitution's guarantee of due process.

## COUNT II
### First and Fourteenth Amendments to the U.S. Constitution; 42 U.S.C. § 1983
### (Overbreadth)

55.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this complaint as though fully set forth herein.

56.    A law is unconstitutionally overbroad when it exceeds its legitimate objectives and punishes conduct that is otherwise constitutionally protected. *See,*

*e.g.*, *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999) (plurality opinion) ("[T]he overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'" (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973))).

57.    "In addressing . . . a facial overbreadth challenge, a court's first task is to ascertain whether the enactment reaches a substantial amount of constitutionally protected conduct." *PEST Comm. v. Miller*, 626 F.3d 1097, 1112 (9th Cir. 2010) (alteration in original) (quoting *Boos v. Barry*, 485 U.S. 312, 329 (1988)).

58.    Here, HB892 goes beyond its legitimate objective—prohibiting double voting—and criminalizes other facets of the voter-registration process. *See Anderson*, 460 U.S. at 788 (laws that "govern[] the registration and qualifications of voters" implicate "the individual's right to vote"). It imposes criminal penalties on voters who maintain multiple registrations and registrants who neglect to include prior-registration information on their applications—regardless of whether these Montanans actually intend to vote twice at an election—and thus exceeds its lawful ends, burdening and chilling constitutionally protected conduct.

59.    Moreover, as a consequence of the election code's aiding-and-abetting provision, *see* Mont. Code Ann. § 13-35-105, HB892 also applies to groups and individuals who help their fellow Montanans access the franchise, chilling an

additional category of constitutionally protected conduct. *See Preminger v. Peake*, 552 F.3d 757, 765 (9th Cir. 2008) ("[V]oter registration is speech protected by the First Amendment.").

60.    By criminalizing and chilling political expression beyond its stated and legitimate purpose of prohibiting double voting, HB892 is fatally overbroad in violation of the First and Fourteenth Amendments.

<u>**COUNT III**</u>
**First and Fourteenth Amendments to the U.S. Constitution; 42 U.S.C. § 1983**
**(Right to Vote)**

61.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this complaint as though fully set forth herein.

62.    When adjudicating right-to-vote claims under the U.S. Constitution, courts "must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Ariz. Democratic Party*, 18 F.4th at 1187 (cleaned up) (quoting *Burdick*, 504 U.S. at 434); *see also Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1024 (9th Cir. 2016) (en banc) (characterizing "standard of review for laws regulating the right to vote" as "balancing and means-end fit framework").

63.    "[A]n election regulation that imposes a severe burden is subject to strict scrutiny and will be upheld only if it is narrowly tailored to serve a compelling state interest." *Nader v. Brewer*, 531 F.3d 1028, 1035 (9th Cir. 2008) (citing *Burdick*, 504 U.S. at 434).

64.    Here, HB892 unjustifiably burdens the right to vote in at least two ways.

65.    First, the law prohibits Montanans from maintaining multiple voter registrations—including registrations in other states—even if voters have no intention of voting more than once at an election, and even though voters might have legitimate reasons to retain prior registrations in order to ensure their ability to cast ballots in the future. *See, e.g.*, *Common Cause Ind.*, 937 F.3d at 960; *cf. Dunn v. Blumstein*, 405 U.S. 330, 342 (1972) (applying struct scrutiny to laws that "force a person who wishes to travel and change residences to choose between travel and the basic right to vote").

66.    Second, the criminal penalties imposed on Montanans who maintain multiple voter registrations or fail to provide prior-registration information have the effect of deterring potential Montana voters from registering in the first place and denying them the franchise during periods of incarceration, both of which impose the severest burden on the right to vote: disenfranchisement.

22

67.    Because these burdens cannot be justified by any legitimate state interests, and are certainly not narrowly tailored to serve any compelling state interests, HB892 violates Montanans' right to vote as protected by the First and Fourteenth Amendments.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

A.    Declare that the provision of HB892 codified at section 13-35-210(5) of the Montana Code violates the First and Fourteenth Amendments to the U.S. Constitution;

B.    Enjoin Defendants, as well as their agents and successors in office, from enforcing the provision of HB892 codified at section 13-35-210(5) of the Montana Code; and

C.    Grant such other or further relief that the Court deems appropriate, including but not limited to an award of Plaintiffs' attorneys' fees and reasonable costs.

Dated: September 29, 2023

By: */s/ Raph Graybill*
Raph Graybill
**GRAYBILL LAW FIRM, PC**
300 4th Street North
P.O. Box 3586
Great Falls, Montana 59403
rgraybill@silverstatelaw.net
ph. (406) 452-8566

Jonathan P. Hawley
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
jhawley@elias.law
ph. (206) 656-0179

Respectfully submitted,

Aria C. Branch\*
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue, Suite 400
Washington, D.C. 20001
abranch@elias.law
ph. (202) 968-4490

*Attorneys for Plaintiffs*

\**Pro hac vice application forthcoming*