Raph Graybill
**GRAYBILL LAW FIRM, PC**
300 4th Street North
P.O. Box 3586
Great Falls, Montana 59403
rgraybill@silverstatelaw.net
ph. (406) 452-8566

Jonathan P. Hawley
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
jhawley@elias.law
ph. (206) 656-0179

Aria C. Branch*
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue NW, Suite 400
Washington, D.C. 20001
abranch@elias.law
ph. (202) 968-4490

*Attorneys for Plaintiffs*

*Admitted pro hac vice*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## HELENA DIVISION

| | |
|---|---|
| MONTANA PUBLIC INTEREST RESEARCH GROUP; MONTANA FEDERATION OF PUBLIC EMPLOYEES, <br><br> Plaintiffs, <br><br> vs. <br><br> CHRISTI JACOBSEN, in her official capacity as Montana Secretary of State; AUSTIN KNUDSEN, in his official capacity as Montana Attorney General; CHRIS GALLUS, in his official capacity as Montana Commissioner of Political Practices, <br><br> Defendants. | CV 23-70-H-BMM-KLD <br><br><br><br> BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................. iii

EXHIBIT INDEX ........................................................................... vi

INTRODUCTION ............................................................................1

BACKGROUND ..............................................................................2

    I.     HB892..................................................................................2

    II.    Plaintiffs' Lawsuit ...........................................................6

LEGAL STANDARD .......................................................................9

ARGUMENT .................................................................................10

    I.     Plaintiffs are likely to succeed on the merits of their vagueness and overbreadth claims. ........................................................11

          A.     HB892 is vague in violation of the Fourteenth Amendment. ...11

          B.     HB892 is overbroad in violation of the First and Fourteenth Amendments. ...................................................................19

    II.    HB892 threatens to deprive Plaintiffs of their constitutional rights and cause irreparable harm. ....................................................25

    III.   The balance of harms and public interest weigh in favor of preliminary injunctive relief..................................................26

CONCLUSION ..............................................................................27

CERTIFICATE OF COMPLIANCE ...................................................29

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983)..............................................................19

*Broadrick v. Oklahoma*,
  413 U.S. 601 (1973)................................................................1

*Brown v. Jacobsen*,
  No. 21-92-H-PJW-DWM-BMM, 2022 WL 122777 (D. Mont. Jan.
  13, 2022) .............................................................................25

*Butcher v. Knudsen*,
  38 F.4th 1163 (9th Cir. 2022) ...................................1, 11, 12

*Cal. Tchrs. Ass'n v. State Bd. of. Educ.*,
  271 F.3d 1141 (9th Cir. 2001) ..........................................18

*Common Cause Ind. v. Lawson*,
  937 F.3d 944 (7th Cir. 2019) .......................................20, 22

*Davis v. Stapleton*,
  480 F.Supp.3d 1099 (D. Mont. 2020)................................26

*Dunn v. Blumstein*,
  405 U.S. 330 (1972)..............................................................21

*Forbes v. Napolitano*,
  236 F.3d 1009 (9th Cir. 2000) ...........................................12

*Giovani Carandola, Ltd. v. Bason*,
  303 F.3d 507 (4th Cir. 2002) ..............................................27

*Imperial Sovereign Ct. of State of Mont. v. Knudsen*,
  No. CV 23-50-BU-BMM, 2023 WL 4847007 (D. Mont. July 28,
  2023) ..............................................................................1, 12

*Indigenous Env't Network v. Trump*,
  428 F.Supp.3d 296 (D. Mont. 2019).................................9, 10

*Jones v. Governor of Fla.,*
    950 F.3d 795 (11th Cir. 2020) ...............................................................26

*Lynce v. Mathis,*
    519 U.S. 433 (1997).................................................................................16

*Melendres v. Arpaio,*
    695 F.3d 990 (9th Cir. 2012) .................................................................26

*Mi Familia Vota v. Hobbs,*
    492 F.Supp.3d 980 (D. Ariz. 2020) .....................................................25

*Mont. Democratic Party v. Eaton,*
    581 F.Supp.2d 1077 (D. Mont. 2008)...................................................27

*Mont. Med. Ass'n v. Knudsen,*
    591 F.Supp.3d 905 (D. Mont. 2022).....................................................26

*Myers v. Fulbright,*
    367 F.Supp.3d 1171 (D. Mont. 2019)...............................12, 14, 19, 23

*Myers v. Thompson,*
    192 F.Supp.3d 1129 (D. Mont. 2016)...................................................10

*NAACP v. Button,*
    371 U.S. 415 (1963).................................................................................12

*Nova Recs., Inc. v. Sendak,*
    706 F.2d 782 (7th Cir. 1983) .................................................................15

*Obama for Am. v. Husted,*
    697 F.3d 423 (6th Cir. 2012) .................................................................27

*PEST Comm. v. Miller,*
    626 F.3d 1097 (9th Cir. 2010) ...............................................................19

*Preminger v. Peake,*
    552 F.3d 757 (9th Cir. 2008) .................................................................19

*Richmond Med. Ctr. for Women v. Gilmore,*
    55 F.Supp.2d 441 (E.D. Va. 1999) .......................................................14

*Rosebud Sioux Tribe v. Trump*,
    495 F.Supp.3d 968 (D. Mont. 2020)......................................................10

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
    709 F.3d 1281 (9th Cir. 2013) ...........................................................10

*United States v. Davis*,
    139 S.Ct. 2319 (2019)........................................................................11

*United States v. Evans*,
    333 U.S. 483 (1948).............................................................................18

*Village of Hoffman Estates v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 489 (1982)............................................................................11

## Statutes

52 U.S.C. § 10307............................................................................20

Ind. Code § 3-14-2-4........................................................................22

La. Stat. Ann. § 18:101 .....................................................................22

Mo. Rev. Stat. § 115.175 ..................................................................24

Mont. Code Ann. § 13-2-514............................................................22

Mont. Code Ann. § 13-35-105....................................................8, 25

Mont. Code Ann. § 13-35-210.....................................................*passim*

Mont. Code Ann. § 45-2-101............................................................13

Mont. Code Ann. § 45-2-103............................................................14

Wis. Stat. § 12.13(1)(c)......................................................................22

## Other Authorities

78 Fed. Reg. 6, 289-03 (Jan. 30, 2013)............................................23

# EXHIBIT INDEX*

| No. | Description | Short Name |
|---|---|---|
| 1 | Declaration of Hunter Losing, dated November 1, 2023 | Losing Declaration |
| 2 | Declaration of Amanda Curtis, dated November 6, 2023 | Curtis Declaration |
| 3 | Transcript of *HB 892 - (H) Hearing - (H) State Administration*, Open Mont. (Mar. 29, 2023), https://www.openmontana.org/montana-legislature-council-data-project/#/events/005c88a8828d | House Committee Transcript |
| 4 | Transcript of *HB 892 - (H) 2nd Reading Passed*, Open Mont. (Mar. 31, 2023), https://www.openmontana.org/montana-legislature-council-data-project/#/events/b1887a55f0df | House Floor Transcript |
| 5 | Transcript of *HB 892 - (S) Hearing - (S) State Administration*, Open Mont. (Apr. 17, 2023), https://www.openmontana.org/montana-legislature-council-data-project/#/events/531e70236848 | Senate Committee Transcript |
| 6 | Transcript of *HB 892 - (S) 2nd Reading Concurred as Amended*, Open Mont. (Apr. 25, 2023), https://www.openmontana.org/montana-legislature-council-data-project/#/events/d831ff68392d | Senate Floor Transcript |
| 7 | Howard Fischer, *Conviction Overturned Against Woman Who Voted in AZ and Colorado in 2010*, Ariz. Capitol Times (July 29, 2015), https:// | Arizona Capitol Times Article |

---

* The exhibits are attached to the declaration of Jonathan P. Hawley, filed concurrently with Plaintiffs' motion.

azcapitoltimes.com/news/2015/07/29/conviction-overturned-against-woman-who-voted-in-az-and-colorado-in-2010

8    *Detailed Bill Information: HB 892*, Mont.    HB892 Bill Information
Legislature, http://laws.leg.mt.gov/legprd/
LAW0203W$BSRV.ActionQuery?P_SESS=202
31&P_BLTP_BILL_TYP_CD=HB&P_BILL_N
O=892&P_BILL_DFT_NO=&P_CHPT_NO=&
Z_ACTION=Find&P_ENTY_ID_SEQ2=&P_S
BJT_SBJ_CD=&P_ENTY_ID_SEQ= (last
visited Oct. 6, 2023)

9    *Remain*, Merriam-Webster, https://    Merriam-Webster
www.merriam-webster.com/dictionary/remain    Remain Definition
(Oct. 6, 2023)

10   *Automatic Voter Registration*, Nat'l Conf. of    NCSL Automatic Voter
State Legislatures, https://www.ncsl.org/    Registration Summary
elections-and-campaigns/automatic-voter-
registration (Sept. 26, 2023)

11   *Voter Registration Cancellations*, U.S. Election    EAC Voter Registration
Assistance Comm'n, https://www.eac.gov/voters/    Cancellations Summary
voter-registration-cancellations (Oct. 31, 2022)

12   *Montana Voter Registration Application*, Mont.    Montana Voter
Sec'y of State, https://sosmt.gov/wp-    Registration
admin/admin-ajax.php?juwpfisadmin=    Application
false&action=wpfd&task=file.download&wpfd_
category_id=766&wpfd_file_id=47309&token=a
cb38cbb998e43108cfd572bc458c4ff&preview=1
(last visited Oct. 12, 2023)

13   *Voter Registration Application*, U.S. Election    Federal Voter
Assistance Comm'n, https://www.eac.gov/sites/    Registration
default/files/eac_assets/1/6/Federal_Voter_    Application
Registration_ENG.pdf (last visited Oct. 12,
2023)

14   *Double Voting*, Nat'l Conf. of State Legislatures,                NCSL Double Voting
     https://www.ncsl.org/elections-and-campaigns/                      Summary
     double-voting (Oct. 25, 2022)

15   *Election Fraud Cases*, Heritage Found., https://                   Heritage Foundation
     www.heritage.org/voterfraud/search?state=MT                        Survey
     (last visited Oct. 13, 2023)

16   *Inaccurate, Costly, and Inefficient: Evidence*                     Pew Center Study
     *That America's Voter Registration System Needs*
     *an Upgrade*, Pew Ctr. on States (Feb. 2012),
     https://www.pewtrusts.org/-/media/legacy/
     uploadedfiles/pcs_assets/2012/
     pewupgradingvoterregistrationpdf.pdf

17   *QuickFacts: Montana*, U.S. Census Bureau,                          Montana Census
     https://www.census.gov/quickfacts/fact/table/                      QuickFacts
     MT/PST045222 (July 1, 2022)

## INTRODUCTION

The vagueness doctrine provides that "no person may 'be held criminally responsible for conduct which they could not reasonably understand to be proscribed.'" *Imperial Sovereign Ct. of State of Mont. v. Knudsen*, No. CV 23-50-BU-BMM, 2023 WL 4847007, at *5 (D. Mont. July 28, 2023) (cleaned up) (quoting *United States v. Harriss*, 347 U.S. 612, 617 (1954)). The overbreadth doctrine in turn "recognize[s] that the First Amendment needs breathing space" by requiring that "statutes attempting to restrict or burden the exercise of First Amendment rights [] be narrowly drawn" and not exceed their legitimate aims. *Broadrick v. Oklahoma*, 413 U.S. 601, 611–12 (1973). These constitutional imperatives are especially important—and the applicable standards of review more exacting—when state laws regulate "political speech, which 'occupies the highest rung of the hierarchy of First Amendment values.'" *Butcher v. Knudsen*, 38 F.4th 1163, 1169 (9th Cir. 2022) (quoting *Snyder v. Phelps*, 562 U.S. 443, 452 (2011)).

House Bill 892 ("HB892") fails these bedrock requirements. Although its ostensible purpose was to reaffirm Montana's ban on double voting, HB892's reach far exceeds this aim. HB892 criminalizes maintaining multiple voter registrations and omitting prior-registration information on voter-registration applications, even if voters and registrants have no intention of voting in more than one place at the same election—and even if they never do. By employing vague language and

unclear standards in a criminal statute regulating voter registration—which enables eligible Montanans to exercise the right to vote—HB892 violates the U.S. Constitution's guarantee of due process. And by punishing protected political expression beyond its legitimate aim of prohibiting double voting, HB892 violates the First and Fourteenth Amendments.

As the 2024 election cycle fast approaches, Montanans should be able to access the franchise without the chill of draconian criminal penalties, and voter-advocacy groups should be able to help eligible citizens register without the fear of prosecution. Double voting in Montana is unlawful, and safeguards already exist to deter the practice. The challenged provisions of HB892 serve no function other than to discourage otherwise-eligible voters from participating in the democratic process. Preliminary injunctive relief is needed to ensure that all Montanans can freely exercise their fundamental constitutional rights during next year's elections—and beyond.

## BACKGROUND

### I.  HB892

HB892 amended the voting limitations codified at section 13-35-210 of the Montana Code. In addition to rearticulating the preexisting ban on double voting, *see* Mont. Code. Ann. § 13-35-210(2), (4), the bill introduced new limits on Montanans' voting rights, pairing vague new voter-registration requirements with

severe criminal penalties. Specifically, Montana law now provides that "[a] person or elector may not purposefully remain registered to vote in more than one place in this state or another state any time, unless related to involvement in special district elections." *Id.* § 13-35-210(5). It further requires that "[a] person or elector previously registered to vote in another county or another state shall provide the previous registration information on the Montana voter registration application." *Id.* Anyone who violates these provisions "shall, on conviction, be fined up to $5,000, be imprisoned for up to 18 months, or both." *Id.* § 13-35-210(6).

Rep. Lyn Hellegaard, HB892's legislative sponsor, claimed that the new law was meant only to "clarify what double voting means in Montana law and that voting in Montana and another state is defined as the same election." Ex. 3 (House Committee Transcript), at 2:23–3:1. Ostensibly spurred by a "recent court ruling" that allowed a voter to cast ballots in both Arizona and Colorado during the same midterm election,[1] Rep. Hellegaard stated that "[t]he bill[] addresses the current vagueness in our statute and attached consequences for breaking our election laws." *Id.* at 3:23–25.

Several legislators nevertheless raised concerns about HB892's vague and problematic language and the serious criminal penalties it imposes. At a Senate

---

[1] Though Rep. Hellegaard did not further describe this incident, she was seemingly referencing an act of double voting from the 2010 midterms, addressed in a case that resolved nearly a decade ago. *See* Ex. 7 (Arizona Capitol Times Article).

committee hearing, Rep. Hellegaard was asked what it means to "purposefully" remain registered to vote in more than one jurisdiction. Ex. 5 (Senate Committee Transcript), at 6:15–20. She first responded by describing what she believed the bill would *not* reach: "[I]f, say[,] you've got somebody that lives out in a rural community and they move into the city into an assisted living and they *forget* to notify the [] election administrator in their rural county that they are moving, that's not purposefully." *Id*. at 6:23–7:3 (emphasis added). As for what HB892 *would* prohibit, Rep. Hellegaard returned to the purpose of banning double voting: "What we're looking for are the people that I described that are registered to vote in California or Arizona. That's their primary [residence] and [they are] registered to vote in Montana. And they vote in both places. Those are the people that we are looking to [] stop . . . from purposefully voting in two places." *Id*. at 6:21–7:11. Rep. Hellegaard then deferred to Dana Corson, the Secretary of State's elections director, who explained, "[P]urposefully is intentional. That's the intent portion of it. . . . With intention. On your own volition[], and they're able to prove that. And that's the third part to it. Having violated the law, can you prove the intent, and can you get a conviction off of it?" *Id.* at 7:18–8:13. Following these attempted clarifications, the questioning legislator remained concerned: "I think you could interpret this any way you want . . . . I am not comfortable with that interpretation. I mean, . . . what hangs in the balance is jail time." *Id.* at 8:19–9:4.

Legislators also objected to HB892's requirement that voters affirmatively disclose prior registrations or face criminal penalties. At a House committee hearing, one legislator noted that if someone neglected to fill out the prior-registration section on an application, "they'd be looking at 18 months in prison and a $5,000 fine"—a concern that went unaddressed by the bill's proponents. Ex. 3 (House Committee Transcript), at 8:2–20. When asked whether the requirement would "increase the burden to vote on the voter" or "increase the burden on the clerk's office[,] or both," the representative from the Montana Association of Clerks and Recorders—Ravalli County Clerk and Recorder Regina Plettenberg— stated that she shared that concern, noting that it was unclear whether clerks would have to refuse registrations if the information were missing and explaining, "I'm not sure what the intent here is[.]" *Id.* at 11:1–12:1.

Throughout the process, legislators noted that HB892's stated purpose was redundant given the safeguards already contained in Montana's election laws—in particular, that absentee voters must already affirm that they only voted once in a given election and that the Montana voter-registration application already requires registrants to affirm the truth of their information under penalty of perjury. *Id.* at 14:23–15:20. As one legislator concluded on the House floor, HB892 "takes what was a very simple state statute and straightforward. No person may vote who is not entitled to vote. Boom. Plain and simple. And that you may not vote in more than

one election. And then we added all these other additional subsections, many of which are already addressed" by existing Montana law and practice. Ex. 4 (House Floor Transcript), at 4:18–5:5. Similarly, during Senate debate, another legislator objected that "[w]e have in Montana very safe, secure elections. But this bill practically implies otherwise." Ex. 6 (Senate Floor Transcript), at 5:2–6. She noted that "[i]n all of the history of Montana's elections and voting, there have been only two people that have been found actually guilty in spite of all the allegations that have been made, only two people in the whole history. We have safe, secure elections. This bill is not needed." *Id.* at 12:6–12.

Despite these criticisms and objections, HB892 passed the House and Senate and was signed into law on May 22, 2023. Ex. 8 (HB892 Bill Information).

## II.    Plaintiffs' Lawsuit

Plaintiff Montana Public Interest Group ("MontPIRG") is a student-directed, nonpartisan membership organization dedicated to empowering the next generation of civic leaders. Ex. 1 (Losing Declaration) ¶ 4. For nearly four decades, it has helped register young voters, efforts that continued even through the COVID-19 pandemic: In 2020, MontPIRG volunteers and interns registered 5,612 voters, with an additional 3,046 registrations during the 2022 election cycle. *Id.* ¶¶ 5–8. In the spring of 2023, MontPIRG had roughly 5,200 members, many of whom were young, highly transient voters who rely on MontPIRG to help them navigate the

6

registration process—and who are at particular risk of prosecution under HB892. *Id.* ¶¶ 9–11. This includes members who recently turned 18 before moving to Montana to attend college, some from states with automatic voter-registration systems. *Id.* ¶ 11. The ambiguities of what voters like these need to do to avoid HB892's severe criminal penalties—for example, whether they must affirmatively cancel prior registrations they might need in the future, or whether innocent mistakes on voter applications might be punishable by fines and imprisonment— will discourage them from registering and voting in Montana. *Id.* ¶¶ 13–14.

HB892 will also injure MontPIRG as an organization, frustrating its mission of encouraging youth participation in the political process. *Id.* ¶ 15. MontPIRG must now inform Montanans about the consequences of violating HB892's new restrictions, diverting its limited resources away from other projects in order to help voters identify and cancel prior registrations. *Id.* ¶¶ 16–18, 21, 23. Given HB892's vagueness and overbreadth, MontPIRG must err on the side of caution and educate voters about a law that could be enforced in any number of ways and punishes even innocent mistakes in the registration process, undermining its mission of increasing youth participation in voting. *Id.* ¶¶ 20, 22. Moreover, MontPIRG's staff and volunteers are themselves at risk of criminal prosecution through the enforcement of HB892, *id.* ¶ 19, since anyone who aids or abets a violation of an election law "is also guilty of a violation," Mont. Code Ann. § 13-

35-105; *see also id.* § 45-2-302. In short, MontPIRG must now help voters navigate an ambiguous law to avoid disenfranchisement—all while exposing its staff and volunteers to potential criminal prosecution. Ex. 1 (Losing Declaration) ¶ 24.

Plaintiff Montana Federation of Public Employees ("MFPE") is Montana's largest union, representing tens of thousands of demographically, geographically, and politically diverse working Montanans—including teachers, state troopers, state employees, and others with jobs that often involve moves to different parts of the state. Ex. 2 (Curtis Declaration) ¶¶ 4–5. MFPE is politically active and encourages its members to register and vote; its members in turn rely on MFPE to help them navigate the voter-registration process. *Id.* ¶ 8. These critical efforts have historically translated to robust political participation: Traditionally, over 85% of MFPE's members are registered, with thousands of members registering for the first time or updating their registrations in just the past five years. *Id.* ¶¶ 8–11.

Like MontPIRG's members and constituents, MFPE's members will be discouraged from registering in Montana due to HB892's ambiguities and onerous criminal penalties. *Id.* ¶¶ 14–15. And, like MontPIRG, MFPE will now be required to divert its limited staff, resources, and voter-advocacy budget to novel efforts to help members identify and cancel prior registrations—and its staff and volunteers

will be at risk of criminal liability simply for helping others participate in the political process. *Id.* ¶¶ 16–24.

Plaintiffs initiated this lawsuit on September 29, 2023, to enjoin Defendants from enforcing the provisions of HB892 codified at section 13-35-210(5) of the Montana Code. *See generally* Compl. for Declaratory & Injunctive Relief, ECF No. 1. Plaintiffs assert three claims under the U.S. Constitution: First, HB892 is vague in violation of the due-process protections of the Fourteenth Amendment, *id.* ¶¶ 49–54; second, it is overbroad in violation of the First and Fourteenth Amendments, *id.* ¶¶ 55–60; and third, it violates the right to vote as guaranteed by the First and Fourteenth Amendments, *id.* ¶¶ 61–67.[2]

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that it likely will succeed on the merits, that it likely will [] suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction will serve the public interest." *Indigenous Env't Network v. Trump*, 428 F.Supp.3d 296, 316 (D. Mont. 2019) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "A court applies a sliding scale approach to a plaintiff's request for a preliminary injunction, whereby the reviewing court balances the

---

[2] Plaintiffs move for a preliminary injunction only as to their vagueness and overbreadth claims.

elements 'so that a stronger showing of one element may offset a weaker showing of another.'" *Id.* at 316 (quoting *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)); *see also, e.g.*, *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) ("[I]f a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips *sharply* in the plaintiff's favor, and the other two *Winter* factors are satisfied." (cleaned up)).

"[I]n the First Amendment context, [on the merits prong], the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction." *Myers v. Thompson*, 192 F.Supp.3d 1129, 1138 (D. Mont. 2016) (second alteration in original) (quoting *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011)).

"The public interest and the balance of the equities factors merge when the government stands as a party." *Rosebud Sioux Tribe v. Trump*, 495 F.Supp.3d 968, 975 (D. Mont. 2020).

## ARGUMENT

Plaintiffs are likely to succeed on the merits of their claims that HB892 is vague and overbroad in violation of the First and Fourteenth Amendments.

Enforcement of HB892 threatens Plaintiffs' constitutional rights and undermines the public interest in ensuring that all eligible citizens can exercise their right to vote. Plaintiffs therefore satisfy the requisite elements for preliminary injunctive relief.

## I.   Plaintiffs are likely to succeed on the merits of their vagueness and overbreadth claims.

HB892 exceeds the bounds of its stated, legitimate purpose—prohibiting double voting, which is already unlawful (and vanishingly rare) in Montana—and burdens and chills protected political expression due to its overbreadth and ambiguity.

### A.   HB892 is vague in violation of the Fourteenth Amendment.

HB892 fails to provide sufficient notice of what it requires of both current Montana voters *and* potential registrants, forcing them to risk severe criminal penalties simply by undertaking their basic right to the franchise.

Since a vague law is "no law at all," *United States v. Davis*, 139 S.Ct. 2319, 2323 (2019), it is "[a] fundamental principle in our legal system [] that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required," *Butcher*, 38 F.4th at 1168 (quoting *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)). "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Village of Hoffman Estates v.*

*Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). In particular, the "standards of permissible statutory vagueness are strict in the area of free expression," *NAACP v. Button*, 371 U.S. 415, 432 (1963), and where "a statute subjects transgressors to criminal penalties, . . . vagueness review is even more exacting," *Forbes v. Napolitano*, 236 F.3d 1009, 1011 (9th Cir. 2000); *see also Myers v. Fulbright*, 367 F.Supp.3d 1171, 1176 (D. Mont. 2019) ("[C]riminal regulation of First Amendment expression is subject to exacting review.").

As the Ninth Circuit has explained, "[l]aws that are impermissibly vague offend due process because they contravene two bedrock constitutional norms": First, that "regulated parties should know what is required of them so they may act accordingly," and second, "that laws must provide proper 'precision and guidance' to ensure that 'those enforcing the law do not act in an arbitrary or discriminatory way.'" *Butcher*, 38 F.4th at 1168 (quoting *Fox Television Stations*, 567 U.S. at 253). Consistent with these first principles, "[t]he void-for-vagueness doctrine requires that criminal laws define an offense 'with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Imperial Sovereign Ct.*, 2023 WL 4847007, at *5 (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). "Statutes failing to meet either requirement violate the Due Process

Clause and prove facially invalid." *Id.* at *5–6 (enjoining ban on "drag story hours" and "sexually oriented shows" on vagueness and overbreadth grounds).

HB892 contravenes both norms. It criminalizes the act of "purposefully remain[ing] registered to vote in more than one place," Mont. Code Ann. § 13-35-210(5), but does not define what it means to "purposefully remain registered." Nor does it specify what affirmative steps a voter must take (if any) to avoid the threat of severe criminal penalties associated with the prohibition. HB892 also requires registrants to "provide [] previous registration information on the Montana voter registration application," *id.*, but does not ascribe a mens rea requirement to the prior-registration disclosure requirement or clarify the extent of the information registrants must include on an application. Consequently, Montana voters and registrants are left to guess what conduct might open them to potential *felony* criminal penalties. *See id.* §§ 13-35-210(6), 45-2-101. Given the absence of precision and direction, the risk of arbitrary enforcement is unacceptably—and unconstitutionally—high.

**Multiple-registration   prohibition.**   HB892   prohibits   "purposefully remain[ing] registered to vote in more than one place." *Id.* § 13-35-210(5). To understand what exactly this means, a person of ordinary intelligence must know three things: what conduct is required, to whom the prohibition applies, and when it applies. The text of HB892 fails to answer any of these questions.

*First*, what it means to "remain registered" is ambiguous. "[W]hen interpreting a statute, courts must first look to the plain meaning of the statute and should look no further if the plain meaning clearly conveys the intent behind the statute." *Myers*, 367 F.Supp.3d at 1176 (citing *Farmers All. Mut. Ins. Co. v. Holeman*, 278 Mont. 274, 277, 924 P.2d 1315 (1996)). Here, however, the plain language of the prohibition does not provide clarity as to what conduct is actually proscribed. Merriam-Webster defines "remain" as "to continue unchanged." Ex. 9 (Merriam-Webster Remain Definition). It is thus unclear whether Montanans with multiple registrations must actively "change" their situation—for example, by notifying election officials in other jurisdictions and taking affirmative action to deregister (and then *confirm* deregistration)—either before or after registering in Montana.

The applicable mens rea only adds to the confusion. It is true, as Mr. Corson noted during HB892's legislative hearings, *see supra* at 4, that the multiple-registration prohibition includes a standard familiar to Montana's criminal laws: "purposefully." *See, e.g.*, Mont. Code Ann. § 45-2-103(1) (listing "the mental states of knowingly, negligently, or purposely"). But "the addition of a mens rea element [is not necessarily] dispositive," as "there are recognized limitations regarding a statutory scienter requirement as some sort of cure-all or antidote in the context of a vagueness challenge." *Richmond Med. Ctr. for Women v. Gilmore*, 55 F.Supp.2d

441, 498–99 (E.D. Va. 1999) (collecting cases), *aff'd*, 224 F.3d 337 (4th Cir. 2000). This case illustrates precisely why: Simply adding "purposefully" to the text of HB892 neither clarifies what conduct is prohibited nor safeguards against arbitrary enforcement. *See Nova Recs., Inc. v. Sendak*, 706 F.2d 782, 789 (7th Cir. 1983) ("A scienter requirement cannot eliminate vagueness . . . if it is satisfied by an 'intent' to do something that is in itself ambiguous.").

For example, a reasonable person would not understand whether *knowingly* remaining registered in multiple jurisdictions, but actively choosing *not* to deregister from any of them, constitutes "purposefully" remaining registered. Nor is it clear whether a voter who only *suspects* that they might be registered elsewhere—perhaps because they came to Montana from Washington, Oregon, or one of many other states with automatic voter registration, *see* Ex. 10 (NCSL Automatic Voter Registration Summary), or because their prior jurisdiction does not have a uniform method of cancelling registrations, *see* Ex. 11 (EAC Voter Registration Cancellations Summary)—would be at risk of prosecution if they are willfully uncertain of these additional registrations. Are Montanans who previously registered elsewhere required to investigate whether they need to affirmatively deregister at prior addresses in other jurisdictions, or whether those earlier registrations are likely to be automatically cancelled if they move or register elsewhere? Further adding to the ambiguity is the stated purpose of HB892:

prohibiting double voting. Is the intent requirement for "remain[ing] registered" linked to the intent to actually vote twice? If so, the statute does not say. It is therefore unclear whether a voter with multiple registrations who lacks any intention of actually voting twice at the same election would fall within the criminal scope of HB892—even if they know of the other registrations but choose not to deregister.

*Second*, HB892 fails to provide sufficient notice as to who is covered by the law. For example, the text does not clarify whether criminal penalties apply to previous Montana registrants who have registered in other jurisdictions before returning to Montana (like out-of-state college students who have come home), or to new Montana registrants who had previously registered in other jurisdictions, or both.

*Third*, it is unclear *when* HB892 applies—in particular, whether current Montana voters who had multiple registrations *before* HB892's enactment fall within the scope of the prohibition. Is a Montanan who had multiple registrations the day before HB892 was signed into a law liable for still "remain[ing] registered to vote in more than one place" today?[3]

---

[3] Given the criminal penalties for violations of HB892, this particular ambiguity presents constitutional infirmities even broader than due process. *See, e.g.*, *Lynce v. Mathis*, 519 U.S. 433, 441 (1997) (law that is "retrospective" and "alter[s] the

In sum, HB892's multiple-registration prohibition does not clearly state what conduct is proscribed and who is liable. It fails to provide Montanans with sufficient notice of potential criminal prosecution and runs the risk of disparate and arbitrary enforcement.

**Prior-registration disclosure requirement.** HB892's vagueness issues extend to its prior-registration disclosure requirement. *See* Mont. Code Ann. § 13-35-210(5) ("A person or elector previously registered to vote in another county or another state shall provide the previous registration information on the Montana voter registration application[.]").

At the outset, it is unclear whether the multiple-registration prohibition's "purposefully" mens rea requirement extends to this next sentence of HB892—meaning that it is possible a registrant could be imprisoned even for inadvertently neglecting to complete that section of the application, or for forgetting about prior registrations and failing to include them. Moreover, the disclosure requirement fails to specify whether a voter must list *only* last-in-time or active registrations or their entire voting history, including inactive and automatic registrations.[4]

definition of criminal conduct or increas[es] the punishment for the crime" violates ex post facto prohibition).

[4] Adding to the uncertainty, both the current iteration of Montana's voter-registration application and the federal application provide space for only *one* prior registration. *See* Ex. 12 (Montana Voter Registration Application); Ex. 13 (Federal Voter Registration Application).

Again, Montanans of ordinary intelligence could be reasonably confused about what they must to do avoid fines and imprisonment, which might be the penalty for even inadvertent omissions of prior-registration information—thus discouraging future registrations and having a "real and substantial" "deterrent effect on legitimate expression." *Cal. Tchrs. Ass'n v. State Bd. of. Educ.*, 271 F.3d 1141, 1151 (9th Cir. 2001) (quoting *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 60 (1976)).

*     *     *

HB892 leaves Montanans to guess what conduct the state's 56 county attorneys and the Attorney General might choose to prosecute. The bill's ambiguities are numerous and pervasive, and consequently it is not "'readily susceptible' to a narrowing construction." *Id.* at 1147 (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1988)); *see also United States v. Evans*, 333 U.S. 483, 486–87 (1948) (distinguishing between "the necessary and proper judicial function of construing statutes and that of filling gaps so large that doing so becomes essentially legislative"). Given that HB892 implicates undeniably protected expression—the fundamental right to vote—and carries with it the risk of potential felony criminal penalties, the U.S. Constitution's due-process guarantee requires far greater clarity and precision than the statute provides. Plaintiffs are therefore likely to succeed on the merits of their vagueness claim.

### B.  HB892 is overbroad in violation of the First and Fourteenth Amendments.

Plaintiffs are also likely to succeed on the merits of their overbreadth claim.

"In the First Amendment context, 'a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Myers*, 367 F.Supp.3d at 1175 (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)). Accordingly, "[i]n addressing . . . a facial overbreadth challenge, a court's first task is to ascertain whether the enactment reaches a substantial amount of constitutionally protected conduct." *PEST Comm. v. Miller*, 626 F.3d 1097, 1112 (9th Cir. 2010) (alteration in original) (quoting *Boos v. Barry*, 485 U.S. 312, 329 (1988)).

HB892 goes far beyond its legitimate objective—prohibiting double voting—and criminalizes maintaining multiple voter registrations in different jurisdictions and failing to provide prior-registration information, even if a voter never intends to cast ballots in more than one place at the same election. By extending beyond its legitimate aim, HB892 burdens and chills the constitutionally protected conduct not only of voters, but also of groups like Plaintiffs that help their members and other Montanans access the franchise. *See Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) (laws that "govern[] the registration and qualifications of voters" implicate "the individual's right to vote"); *Preminger v.*

*Peake*, 552 F.3d 757, 765 (9th Cir. 2008) ("[V]oter registration is speech protected by the First Amendment.").

**Multiple-registration prohibition.** Preventing double voting is a legitimate aim. This case does not challenge Montana's prior ban on double voting, *see* Mont. Code Ann. § 13-35-210(1) (2021) ("No person may vote more than once at an election."), nor does it challenge HB892's rearticulation of the ban (or, for that matter, the federal equivalent), *see id.* § 13-35-210(2), (4) (2023) ("An elector may not vote more than once at an election. . . . A person or elector may not vote in this state more than once at any election held in this state or vote in both this state and another state or territory in the same or equivalent elections[.]"); 52 U.S.C. § 10307(e) (criminalizing "vot[ing] more than once" in presidential and congressional elections).

But "[w]hile double voting is surely illegal, having two open voter registrations is a different issue entirely." *Common Cause Ind. v. Lawson*, 937 F.3d 944, 960 (7th Cir. 2019). There are myriad reasons why maintaining a prior registration might be needed to safeguard a voter's ability to cast a ballot and avoid the irreparable harm of disenfranchisement. As the Seventh Circuit recently explained in the context of a challenge to an Indiana law brought under the National Voter Registration Act,

> someone might move to Kansas from Indiana to take a new job, and upon arrival in Kansas immediately register to vote in Kansas. But if

her personal circumstances change before Election Day—she flunks a probationary period on the job, a family member becomes sick, a better opportunity arises in Indiana—the person might decide to return to her former residence in Indiana. . . . Especially in states that have an early registration deadline, it may be perfectly rational for a voter to register in a new location before getting around to canceling the old Indiana registration, selling an Indiana house, or severing other formal connections with Indiana. Every year millions of Americans go off to college in August. Some drop out by November, for academic, financial, or other reasons, and land back on their parents' doorsteps. They will *vote* in only one place, even if they have open registrations in two.

*Id.* In other words, voters might need to maintain multiple voter registrations to ensure they can cast a *single* ballot.

Registered Montana voters might not know where they will end up residing on election day, and might have previously—*and lawfully*—registered to vote at different times in different jurisdictions when they resided in different places. Maintaining those valid voter registrations affords them not only convenience, but also the necessary flexibility to ensure that they do not need to choose between a last-minute change of residence and their ability to vote. *Cf. Dunn v. Blumstein*, 405 U.S. 330, 342 (1972) (applying struct scrutiny to durational residency laws that "force a person who wishes to travel and change residences to choose between travel and the basic right to vote"). Maintaining an additional registration might ensure that, if a voter's residence changes close to election day, they will still be able vote in a given jurisdiction without needing to re-register (which might be impossible if the state has an early registration deadline). College students, young

21

people, and voters who temporarily relocate for job reasons—including Plaintiffs' members and constituents—are among the sorts of highly transient voters who might have wholly justifiable reasons to remain registered in more than one jurisdiction to safeguard their access to the franchise.

Tellingly, while double voting in some form is prohibited in 49 states and the District of Columbia, "[i]n the over-whelming majority of states, it is not illegal to be registered to vote in two places." *Common Cause Ind.*, 937 F.3d at 960; *see also* Ex. 14 (NCSL Double Voting Summary).[5] This fact underscores that access to multiple registrations might be needed to ensure a voter's ability to cast a single ballot in an election. Indeed, *Montana law itself* recognizes such a fail-safe option: "An elector who changes residence to a different county 30 days or less before an election may . . . vote in person or by absentee ballot in the precinct and county where previously registered; *or* . . . update the elector's registration information and vote in the elector's new county of residence." Mont. Code Ann. § 13-2-514(2) (emphasis added). The need for flexibility is especially important in periods close to elections, and, for some voters, depriving them of this option is tantamount to depriving them of their right to vote. By extension, this will prevent Plaintiffs from

---

[5] When the National Conference of State Legislatures compiled statutes last year, only *three* states—Indiana, Louisiana, and Wisconsin—prohibited voters from maintaining multiple (otherwise-lawful) registrations. *See* Ind. Code § 3-14-2-4; La. Stat. Ann. § 18:101(B); Wis. Stat. § 12.13(1)(c).

helping their members and fellow Montanans exercise the franchise, frustrating their missions of expanding access to the ballot box for eligible Montanans.

Notably, HB892's stated and legitimate sweep is limited to prohibiting double voting, and the number of Montana voters who actually intend to vote more than once at an election is small to the point of nonexistence. During debate over HB892 on the Senate floor, one legislator noted only *two* instances of voter fraud in the history of Montana elections, Ex. 6 (Senate Floor Transcript), at 12:6–12, in which literally millions of ballots have been cast.[6] Compared to this figure, virtually *any* number of unconstitutional applications—which is to say, preventing voters who do not intend to vote more than once at an election from having access to multiple registrations—would be considered "substantial." *Myers*, 367 F.Supp.3d at 1175 (quoting *Stevens*, 559 U.S. at 473). And while it is difficult to estimate precisely how many Montanans maintain multiple registrations (including for the same reasons it might be difficult for a person to identify prior registrations, *see supra* at 15), a 2012 study by the Pew Center on the States found that approximately 2.75 million Americans were registered to vote in more than one state, Ex. 16 (Pew Center Study). This amounted to more than 1% of the total voting-age population in 2012, *see* Estimates of the Voting Age Population for

---

[6] This figure is confirmed by the Heritage Foundation, which reports only two election-fraud cases in Montana—neither of which involved double voting. *See* Ex. 15 (Heritage Foundation Survey).

2012, 78 Fed. Reg. 6,289-03 (Jan. 30, 2013), a percentage that would equal roughly 10,000 voters in Montana today, *see* Ex. 17 (Montana Census QuickFacts). In total, the potentially unconstitutional application of HB892's multiple-registration prohibition could extend to many thousands of eligible Montana voters.[7]

**Prior-registration disclosure requirement.** HB892's prior-registration disclosure requirement fares no better under this analysis. The requirement to provide previous registration information—and the risk of a felony conviction for failing to do so, whether intentionally or not—applies to *all Montana registrants*, regardless of their actual intent to commit double voting. Indeed, to the extent the requirement includes *inactive* registrations, *see supra* at 17, it has nothing to do with the potential to actually vote twice at the same election. Like the multiple-registration prohibition, the prior-registration disclosure requirement is unconstitutionally overbroad because it sweeps legitimate, otherwise-protected conduct within the scope of its criminal penalties.

---

[7] Notably, election laws in other states demonstrate how registration limitations can be tailored to the issue of double voting and thus avoid overbreadth concerns. *See, e.g.*, Mo. Rev. Stat. § 115.175 ("Any person who knowingly or willfully . . . registers to vote *with the intention of voting more than once in the same election* shall be guilty of a class one election offense." (emphasis added)).

*      *      *

Far beyond preventing double voting, HB892 chills political expression by making it riskier for individuals to register to vote and, consequently, costlier for organizations to promote voter engagement. Some potential voters will forgo registering in Montana to avoid sacrificing a registration in another jurisdiction they might also need. Others will be deterred from registering because of the onerous criminal penalties now attached to the voter-registration process. The chilling effect on political expression thus extends not only to voters with multiple registrations, but to anyone in the state who wishes to access the franchise—and, due to the election code's aiding-and-abetting provision, *see* Mont. Code Ann. § 13-35-105, individuals like Plaintiffs' volunteers and staff who help Montanans register.

In short, because HB892 criminalizes and chills political expression beyond its legitimate purpose, Plaintiffs are likely to succeed on their claim that it is fatally overbroad in violation of the First and Fourteenth Amendments.

## II.   HB892 threatens to deprive Plaintiffs of their constitutional rights and cause irreparable harm.

Unless the challenged provisions of HB892 are enjoined, Plaintiffs, their members, and their constituents will suffer severe and irreparable harm.

"It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Brown v. Jacobsen*, No. 21-92-H-

PJW-DWM-BMM, 2022 WL 122777, at *4 (D. Mont. Jan. 13, 2022) (three-judge court) (quoting *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 837 (9th Cir. 2020)). Here, Plaintiffs' constitutionally protected voter-registration activities will be chilled and disrupted by HB892, *see, e.g.*, *Mi Familia Vota v. Hobbs*, 492 F.Supp.3d 980, 988 (D. Ariz.) (finding irreparable injury where "the harm suffered is loss of possibly tens of thousands of voter registrations, and a burden to Plaintiffs' First and Fourteenth Amendment rights to organize voters"), *stayed on other grounds*, 977 F.3d 948 (9th Cir. 2020) (per curiam), and their members' due-process and voting rights will be violated as a result of the law's vagueness and overbreadth, *see, e.g.*, *Davis v. Stapleton*, 480 F.Supp.3d 1099, 1108–09 (D. Mont. 2020) (finding irreparable harm where plaintiffs were likely to succeed on due-process claim); *Jones v. Governor of Fla.*, 950 F.3d 795, 828 (11th Cir. 2020) (per curiam) ("The denial of the opportunity to cast a vote that a person may otherwise be entitled to cast—even once—is an irreparable harm.").

## III.   The balance of harms and public interest weigh in favor of preliminary injunctive relief.

Both the balance of harms and public interest support a preliminary injunction.

"In balancing the equities, considerations include whether 'the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences.'" *Mont. Med. Ass'n v. Knudsen*, 591 F.Supp.3d 905, 916 (D. Mont.

2022) (quoting *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016)). Here, "it is [] in the public interest to prevent the violation of a party's constitutional rights," *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (cleaned up), and there is also a strong public interest in "permitting as many qualified voters to vote as possible," *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012).

By contrast, "a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (cleaned up). Nor would Defendants be harmed by the maintenance of the status quote ante prior to the enactment of the challenged provisions of HB892—double voting does not occur in Montana, given the preexisting legal and procedural safeguards against it.

## CONCLUSION

While promoting HB892 before the House State Administration Committee, the bill's sponsor concluded, "When our citizens exercise the right to choose their representatives and leaders, we want their voices to be counted and not diluted by schemes." Ex. 3 (House Committee Transcript), at 17:24–18:2. Whether by design or simply in effect, HB892 itself constitutes a scheme to chill Montanans' participation in the political process and burden their right to vote. As this Court

27

once observed, "[i]f liberty and equality, as is thought by some, are chiefly to be found in democracy, they will be best attained when all persons alike share in the government to the utmost." *Mont. Democratic Party v. Eaton*, 581 F.Supp.2d 1077, 1078 (D. Mont. 2008) (Molloy, J.) (quoting Aristotle). A preliminary injunction is therefore needed to ensure that all Montana voices—and votes—are counted.

Plaintiffs respectfully request that the Court preliminarily enjoin Defendants from enforcing the provisions of HB892 codified at section 13-35-210(5) of the Montana Code.

Dated: November 6, 2023

By: _____

Raph Graybill
**GRAYBILL LAW FIRM, PC**
300 4th Street North
P.O. Box 3586
Great Falls, Montana 59403
rgraybill@silverstatelaw.net
ph. (406) 452-8566

Jonathan P. Hawley
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
jhawley@elias.law
ph. (206) 656-0179

Respectfully submitted,

Aria C. Branch*
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue NW, Suite 400
Washington, D.C. 20001
abranch@elias.law
ph. (202) 968-4490

*Attorneys for Plaintiffs*

**Admitted pro hac vice*

28

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief contains 6,499 words, excluding the

contents listed in D. Mont. L.R. 7.1(d)(2)(E).

Dated: November 6, 2023

_____

*Counsel for Plaintiffs*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 6th day of November, 2023, a copy of the foregoing document was served on the following persons by the following means:

| 4,5 | CM/ECF |
| --- | --- |
| | Hand Delivery |
| | Mail |
| 1,2,3 | Certified Mail |
| | Fax |
| | E-Mail |

1.  Christi Jacobsen
    Montana Secretary of State
    1301 E 6th Ave.
    Helena, MT 59601

2.  Austin Knudsen
    Montana Attorney General
    215 N Sanders, Third Floor
    Helena, MT 59601

3.  Chris Gallus
    Montana Commissioner of Political Practices
    1209 8th Ave.
    Helena, MT 59601

4.  Dale Schowengerdt
    Landmark Law PLLC
    7 West 6th Ave., Ste. 518
    Helena, MT 59601
    dale@landmarklawpllc.com

5.  Katie Smithgall
    Consovoy McCarthy PLLC
    1600 Wilson Blvd, Ste. 700
    Arlington, VA 22209
    katie@consovoymccarthy.com

                                        */s/ Emma Edwards*
                                        GRAYBILL LAW FIRM, P.C.

30