## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## HELENA DIVISION

| | |
|---|---|
| MONTANA PUBLIC INTEREST RESEARCH GROUP; MONTANA FEDERATION OF PUBLIC EMPLOYEES, | CV-23-70-H-BMM |
| Plaintiffs, | **ORDER** |
| v. | |
| CHRISTI JACOBSEN, in her official capacity as Montana Secretary of State; AUSTIN KNUDSEN, in his official capacity as Montana Attorney General; CHRIS GALLUS, in his official capacity as Montana Commissioner of Political Practices, | |
| Defendants, and | |
| REPUBLICAN NATIONAL COMMITTEE; and MONTANA REPUBLICAN PARTY, | |
| Defendant-Intervenors. | |

## INTRODUCTION

Plaintiff Montana Public Interest Group ("MontPIRG") and Plaintiff Montana

Federation of Public Employees ("MFPE") (collectively "Plaintiffs") filed a motion

for a preliminary injunction on November 6, 2023. (Doc. 11.) Restoring Integrity and Trust in Elections, Inc. ("RITE") filed an amicus curiae brief in opposition to MontPIRG's motion on November 20, 2023. (Doc. 21.) Defendant Austin Knudsen ("the Attorney General") filed a response to MontPIRG's motion on December 1, 2023. (Doc. 30.) Defendants Republican National Committee and Montana Republican Party (collectively "Republican Party Defendants") filed a response to MontPIRG's motion on January 18, 2024. (Doc. 39.) The Attorney General filed a notice of supplemental authority on January 29, 2024 (all defendants collectively "Defendants"). (Doc. 49.) Plaintiffs filed a reply on December 15, 2023. (Doc. 33.) The Court conducted a motion hearing on March 20, 2024, in Great Falls, Montana. (Doc. 71.)

## FACTUAL AND LEGAL BACKGROUND

This case concerns House Bill 892 ("HB 892") and its amendments to Mont. Code Ann. § 13-35-210. Plaintiffs allege that HB 892 criminalizes the act of maintaining multiple voter registrations and criminalizes the failure to include prior voter registration information on Montana voter registration applications, even if a registrant votes only in one place. (Doc. 1 at 3.) Plaintiffs do not challenge HB 892's augmentation of Montana's previous ban on double voting. (*Id.* at 9.) Plaintiffs instead assert that HB 892 exceeds an appropriate prohibition on double voting and creates vague, overbroad restrictions that will negatively affect the franchise. (*Id.*)

2

HB 892 amends Mont. Code Ann. § 13-35-210(1) and (3) (formerly section 2) and adds sections (2), (4), (5), (6), and (7). Mont. Code Ann. § 13-35-210(5) lies at the heart of this action. Mont. Code Ann. § 13-35-210(5), as amended by HB 892, provides as follows:

> A person or elector may not purposefully remain registered to vote in more than one place in this state or another state any time, unless related to involvement in special district elections. A person or elector previously registered to vote in another county or another state shall provide the previous registration information on the Montana voter registration application provided for in [Mont. Code Ann.] § 13-2-110.

Mont. Code Ann. § 13-35-210(6) provides for felony penalties for a person convicted of violating Mont. Code Ann. § 13-35-210(5). Section 6 provides in pertinent part that "[a] person who violates this section shall, on conviction, be fined up to $5,000, be imprisoned for up to 18 months, or both." Mont. Code. Ann. § 13-35-210(6). The challenged portion of HB 892 has two separate but related effects: 1) prohibits a person from purposefully remaining registered to vote in multiple jurisdictions ("multiple registration prohibition"); and 2) requires a person registering to vote using the Montana voter registration application to provide prior voting registration information ("prior registration disclosure requirement"). Mont. Code Ann. § 13-35-210(5)

Plaintiffs' vagueness challenge argues that HB 892 "fails to provide sufficient notice as to what it requires of both current Montana voters and voter-registration applicants, forcing them to risk severe criminal penalties simply by undertaking their

3

basic right to the franchise." (*Id.* at 11.) Plaintiffs claim that HB 892 imposes criminal penalties both for having multiple voter registrations and for failing to provide prior-registration information on Montana's voter-registration application, regardless of intent. (*Id.* at 15.)

With regard to overbreadth, Plaintiffs claim that HB 892 criminalizes the practice of maintaining multiple voter registrations and in the process inhibits protected political expression. (*Id.* at 14.) Plaintiffs further charge that HB 892 places an unjustified and unlawful burden on the right to vote. (*Id.* at 16.) Plaintiffs point to the felony penalties potentially imposed for violating HB 892 as not being justified or narrowly tailored (*Id.* at 17.) Plaintiffs claim that the felony penalties fail to support the purported interest of the Montana Legislature. (*Id.*)

Plaintiffs challenge HB 892 as violating the Fourteenth Amendment to the U.S. Constitution for vagueness, violating the First and Fourteenth Amendments to the U.S. Constitution for overbreadth, and violating the First and Fourteenth Amendments to the U.S. Constitution by infringing on the right to vote. (*Id.* at 18-23.) Plaintiffs ask the Court to declare that the section of HB 892 codified in Mont. Code Ann. § 13-35-210(5) violates the First and Fourteenth Amendments to the U.S. Constitution. (*Id.* at 23.) Plaintiffs seek an injunction against the Defendants, their agents, and their successors from enforcing the HB 892 provisions codified in Mont.

Code. Ann. § 13-35-210(5). (*Id.*) Plaintiffs additionally seek reasonable fees and costs. (*Id.*)

The Court previously granted Defendants' motion to take judicial notice of a transcript of a proceeding conducted in the case *League of Women Voters of Montana v. Knudsen et al.*, Cause No. DV-23-1072, in the Montana Eighteenth Judicial District Court, Gallatin County, Montana. (Doc. 70.)

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction must establish the following four elements: 1) that they are likely to succeed on the merits; 2) that they are likely to suffer irreparable harm in the absence of preliminary relief; 3) that the balance of equities tips in the plaintiff's favor; and 4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). The Ninth Circuit also employs a "sliding scale" approach under which a preliminary injunction may be granted "when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor.*" All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011).

A court may balance the requirements for a preliminary injunction "so that a stronger showing of one element may offset a weaker showing of another." *Id.* at 1131. A preliminary injunction proves to be an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter,*

555 U.S. at 22. A federal court must interpret the law as would the state's highest court when interpreting a state statute as a matter of first impression. *See In re Kolb*, 326 F.3d 1030, 1037 (9th Cir. 2003).

## DISCUSSION

The Court will discuss first whether Plaintiffs have standing to challenge HB 892. The Court will then examine whether *Purcell v. Gonzalez*, 549 U.S. 1 (2006), bars consideration of the merits of Plaintiffs' motion for a preliminary injunction. The Court lastly will assess the merits of Plaintiffs' motion for a preliminary injunction.

### I.      Whether Plaintiffs have standing to challenge HB 892.

Article III of the U.S. Constitution limits the federal judicial power to the adjudication of "Cases" and "Controversies." U.S. Const. Art. III, § 2, cl. 1. This fundamental limitation "is founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Summers v. Earth Island Inst.*, 555 U.S. 488, 492–93 (2009) (quoting *Warth v. Seldin*, 422 U.S. 490, 498, (1975)). To establish "a case or controversy" within the meaning of Article III, a plaintiff must demonstrate the following elements: 1) an "injury in fact" that is concrete and particularized, actual or imminent, and not hypothetical or conjectural; 2) a causal connection between the injury and defendant's conduct or omissions; and 3) a likelihood that the injury will be redressed by a favorable decision. *See Spokeo, Inc.*

*v. Robins*, 578 U.S. 330, 338 (2016). The party asserting federal subject matter jurisdiction bears the burden of establishing the elements of standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Plaintiffs contend that they possess both organizational and associational standing to bring their claims. (Doc. 33 at 3-4.) A plaintiff invoking organizational standing must demonstrate the same elements as an individual asserting standing: 1) that they have suffered an injury in fact; 2) that the alleged injury proves "fairly traceable" to a defendant's conduct; and 3) that the injury proves judicially redressable. *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021) (quoting *Lujan,* 504 U.S. at 560-61.)

The Ninth Circuit has interpreted organizational standing to include instances where a defendant's behavior has frustrated the plaintiff's mission and caused the plaintiff to divert resources in response. *E. Bay Sanctuary Covenant*, 993 F.3d at 663. Plaintiffs contend that HB 892 frustrates their respective organizational missions. (*See* Doc. 13-1); (Doc. 13-2). Plaintiff MontPIRG, a non-partisan student-focused organization, asserts that its mission includes "registering voters, giving [voters] the tools to have their voices heard and taking down barriers between young people and their constitutional right to vote." (Doc. 13-1 at 3.) Plaintiff MFPE similarly claims that its mission as a union includes helping MFPE members

navigate the voter registration process. (Doc. 13-2 at 5.) MFPE notes that over 5,000 MFPE members either have registered in Montana for the first time or updated their Montana voter registration address since 2018. (Doc. 13-2 at 5.)

The analysis in *Mar. for Our Lives Idaho v. McGrane*, No. 1:23-CV-00107-AKB, 2023 WL 6623631 (D. Idaho Oct. 11, 2023), proves instructive with respect to the diversion of resources requirement to establish organizational standing. The Idaho district court determined that the plaintiff March for Our Lives Idaho ("MFOL") possessed organizational standing pursuant to an alleged diversion of resources injury. *Id.* at *6. MFOL alleged that it would have to "divert resources towards voter education from other programming to ameliorate [Idaho House Bill 124 and House Bill 340]'s disenfranchising and vote suppression impacts." *Id.* MFOL'S divergence of resources argument supported MFOL's assertion of organizational standing. *Id.*

Plaintiffs assert that HB 892 similarly has forced the Plaintiffs to divert organizational resources. (Doc. 33 at 2.) Plaintiff MontPIRG claims that it will be forced to deploy its limited resources to "help voter[s] cancel prior [voting] registrations" if HB 892 stands. (Doc. 13-1 at 6.) Plaintiff MFPE alleges that it will be forced to expend resources to identify and cancel voter registrations in other states. (Doc. 13-2 at 6.) MFPE asserts that the resource redirection may result in MFPE not being able to help members register to vote at all. (*Id.* at 7.)

The Court determines that HB 892 has frustrated the purpose of both MontPIRG and MFPE to the extent that HB 892's multiple registration prohibition and prior registration disclosure requirement perceptibly impair Plaintiffs' ability to navigate and advise on the Montana voter registration process. HB 892 likely forces Plaintiffs to direct resources from their voter registration mission to comply with HB 892. Plaintiffs sufficiently have demonstrated that HB 892 frustrates Plaintiffs' organizational missions, and that HB 892 will cause Plaintiffs to divert resources in response to that frustration of purpose. Plaintiffs retain organizational standing. *See Mar. for Our Lives Idaho,* 2023 WL 6623631, at *6. The Court need not consider whether Plaintiffs possess associational standing.

## II.  Whether *Purcell* bars the Court from reaching the merits of Plaintiffs' motion for a preliminary injunction.

Republican Party Defendants contend that *Purcell* requires the Court to deny the relief sought by Plaintiffs' motion for a preliminary injunction. (Doc. 39 at 23.) The U.S. Supreme Court in *Purcell* reversed the Ninth Circuit's granting of a preliminary injunction against enforcement of Arizona's Proposition 200. That voter registration law required proof of citizenship when registering to vote and identification when voting on election day. 549 U.S. at 2. The district court denied the plaintiffs' request for a preliminary injunction on September 11, 2006, approximately two months before the general election. The district court did not issue findings of fact or conclusions of law when it released its order denying the

9

request for a preliminary injunction. *Id.* The Ninth Circuit set its briefing schedule on the claim to be completed two weeks after the upcoming 2006 general election. *Id.* The Ninth Circuit granted the plaintiffs' request for an injunction pending appeal without oral argument. The Ninth Circuit issued a four-sentence order, lacking in explanation or analysis, enjoining Proposition 200 approximately four weeks before the November 7, 2006 general election. *Id.* at 3. The U.S. Supreme Court reversed. The district court's "findings were important because resolution of legal questions in the Court of Appeals required evaluation of underlying factual issues." *Id.* The Ninth Circuit had failed to weigh considerations specific to election cases, including the risk of voter confusion and voter disenfranchisement in granting the injunction pending appeal. *Id.* at 4-5.

The U.S. Supreme Court subsequently has interpreted *Purcell* as standing for the proposition that "lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 425 (2020) (reversing district court's unilateral order, issued five days before the scheduled primary election, that absentee ballots mailed and postmarked after election day, April 7, 2020, still counted so long as they were received by April 13, 2020). The U.S. Supreme Court noted that extending the date by which ballots may be cast by voters—not just received by the municipal clerks

but cast by voters—for an additional six days after the scheduled election day fundamentally would have altered the nature of the election. *Id.*

The U.S. Supreme Court has not defined the relevant term "on the eve of an election." *See, e.g., League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1371 (11th Cir. 2022). The U.S. Supreme Court, for example, has stayed injunctions that would have changed election laws thirty-two days before an election, *North Carolina v. League of Women Voters of N.C.*, 574 U.S. 927 (2014), thirty-three days before an election, *Purcell*, 549 U.S. at 2, and sixty-one days before an election, *Husted v. Ohio State Conference of NAACP*, 573 U.S. 988 (2014). The voting law at issue in *League of Women Voters of N.C.* imposed voter identification requirements, reduced early voting, closed polling places on the final Saturday before an election, eliminated same-day voter registration, and terminated the preregistration of 16- and 17-year-olds in high schools, amongst other voting issues. 574 U.S. at 927 (J. Ginsburg, dissenting). *Husted* addressed a reduction of the length of the early in person voting period and the elimination of a provision that allowed same day registration and voting in the week before an election. *See Ohio State Conf. of N.A.A.C.P. v. Husted*, 43 F. Supp. 3d 808, 812 (S.D. Ohio), aff'd, 768 F.3d 524 (6th Cir. 2014), vacated sub nom. *Ohio State Conf. of The Nat. Ass'n For The Advancement of Colored People v. Husted*, No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014), and vacated sub nom. *Ohio State Conf. of The Nat. Ass'n For The*

*Advancement of Colored People v. Husted,* No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014). The voting laws at issue in League *of Women Voters of N.C.*, 574 U.S., and *Husted*, 573 U.S. at 135, appear to be distinguishable from HB 892 in terms of scope and in terms of regulated activity.

Defendants advise that the deadline for registering to vote for the Montana presidential primary and Montana state primary election falls 47 days from the March 20, 2024 hearing, or on approximately May 6, 2024. (Doc. 74 at 48.) The Court further recognizes that the 2024 presidential election occurs on November 5, 2024, or approximately 196 days from the date of this order. The 2024 general election likely occurs outside *Purcell*'s concern as this order is not being issued on the eve of an election. *See, e.g., League of Women Voters of N.C.*, 574 U.S. 927 (thirty-three days before an election). *Purcell* does not bar the Court's granting of a preliminary injunction against HB 892 for purposes of the Montana 2024 general election. 549 U.S. at 2.

It is true that the Montana primary election registration deadline appears to be within the purview of the cases interpreting the phrase "on the eve of an election." The Court determines, however, that enjoining HB 892's multiple registration prohibition and prior registration disclosure requirement likely will not lead to voter confusion and disenfranchisement for the Montana primary election set for June 4, 2024. The Court takes judicial notice of the testimony given by Regina Plettenburg

("Plettenberg"), the Ravalli County Clerk and Record Election Administrator in the Montana state court action in the Eighteenth Judicial District, Gallatin County, Montana, *League of Women's Voters*, Cause No. DV-23-1072. (Doc. 63 at 108.) Plettenberg also serves as the chairperson for the Montana Association of Clerk and Recorder's legislative committee. (*Id.*) Plettenberg testified that she received guidance from the Montana Secretary of State's office that "[HB 892] wouldn't change any of our [election workers] – the current practice we were following before." (*Id.* at 116.) Plettenburg further testified that "HB 892's [prior registration disclosure requirement] codified Montana's long-standing requirement to supply previous registration information." (*Id.* at 132.)

It could be argued that to enjoin HB 892's multiple voter registration prohibition and prior registration disclosure requirements may lead to confusion and voter disenfranchisement if those provisions changed Montana voting procedures and requirements. The evidence before the Court, including Plettenberg's testimony from *League of Women Voters* (Doc. 63), indicates, however, that the multiple voter registration prohibition and prior registration disclosure requirements likely *do not* substantively change Montana voting registration procedure. (*See* Doc. 63 at 116.) The Court determines that enjoining enforcement of HB 892 will not lead to voter confusion and disenfranchisement where the effect of HB 892's multiple voter registration prohibition and prior registration disclosure requirements have not

13

substantively changed the operation of Montana registration procedures. *Republican Nat'l Comm.*, 589 U.S. at 425; *cf. League of Women Voters of Ohio v. LaRose*, 489 F. Supp. 3d 719, 741 (S.D. Ohio 2020) (Ohio district court declining to grant an injunction concerning absentee ballot curing procedures where such injunction would result in a "major rule change" for the Ohio Secretary of State and local election boards.) The Court concludes that *Purcell*'s caution against changing voting laws on the eve of an election does not apply in this action.

## III.   Whether Plaintiffs have fulfilled the *Winter* factors for injunctive relief.

The Court next will evaluate the *Winter* factors.

### a.  Likelihood of success on the merits

Likely success on the merits represents the "most important" factor under *Winter*. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). The Court will discuss Plaintiffs' vagueness claim and overbreadth claim separately with respect to their likelihood of success on the merits.

#### i.  Vagueness claim.

A criminal law can be void if it is "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). A law is not unconstitutionally vague simply because it is difficult to determine whether it has been violated in a particular case. Instead, there must be an unreasonable amount of

indeterminacy or subjectivity regarding what conduct could be prohibited in the first place. *United States v. Williams*, 553 U.S. 285, 306 (2008). For example, *Williams* rejected a vagueness challenge to a child pornography statute that required that a defendant hold the belief, and make a statement that reflected that belief, that the material at issue constituted child pornography. By contrast, the U.S. Supreme Court in *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971), struck down on vagueness grounds a statute that tied criminal culpability to wholly subjective judgments whether the defendant's conduct was "annoying" or "indecent" without statutory definitions, narrowing context, or settled legal meanings.

The void-for-vagueness doctrine has special purchase for laws that implicate First Amendment freedoms. Although "perfect clarity is not required even when a law regulates protected speech," "vagueness concerns are more acute when a law implicates First Amendment rights and, therefore, vagueness scrutiny is more stringent." *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)). The U.S. Supreme Court has determined additionally that "[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity," *NAACP v. Button*, 371 U.S. 415, 433 (1963) (considering a vagueness challenge to a state supreme court's declaratory judgment that defined the purview of state laws prohibiting certain solicitations of legal business).

15

The U.S. Supreme Court in *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972), considered a vagueness challenge related to anti-picketing and anti-noise ordinance on school property during school hours. *Grayned* noted that "where a vague statute 'abut(s) upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of (those) freedoms'" *Id.* (alterations in original). The U.S. Supreme Court ultimately rejected the vagueness challenge, however, due to its conclusion that it did not face a "vague, general 'breach of the peace' ordinance, but a statute written specifically for the school context, where the prohibited disturbances are easily measured by their impact on the normal activities of the school." *Id.* at 112 (citations omitted).  The ordinance gave "fair notice" to those to whom it was directed given this "particular context." *Id.*

With respect to HB 892, potential issues arise whether the mens rea of "purposefully" applies both to the multiple registration prohibition and to the prior registration disclosure requirement. The Court also recognizes vagueness concerns stemming from the retroactivity and scope of HB 892 to the following areas: 1) whether its requirements apply to voters newly registering in Montana; 2) voters registering in a new county in Montana when they were previously registered in Montana; 3) voters who maintain a Montana voter registration but have not re-registered since HB 892 took effect; or 4) all of the above categories of voters. The plain language of HB 892 does little to clarify these questions. The Court remains

16

concerned that voters lack notice as to what Montana law requires of them when registering to vote. *See Johnson*, 576 U.S. at 595. The Court's concerns may rise to the level of raising substantial questions going to the merits. *All. for the Wild Rockies,* 632 F.3d at 1134. Further development of the factual record would be required, however, to determine Plaintiffs' vagueness claim.

The Court need not decide whether Plaintiffs have demonstrated likely success on the merits despite the recognized concerns with the vagueness of HB 892. The Court determines that the Plaintiffs have demonstrated likely success on the merits of their overbreadth claim. The Court's analysis will turn to Plaintiffs' overbreadth claim.

### ii.  Overbreadth claim

The overbreadth doctrine instructs a court to hold a statute facially unconstitutional even though it may have lawful applications, and even at the behest of someone to whom the statute lawfully can be applied. *United States v. Hansen*, 599 U.S. 762, 769 (2023). The overbreadth doctrine exists "out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003). HB 892 presents these overbreadth concerns.

17

In a facial challenge to a law's validity under the First Amendment, the "law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n. 6 (2008)). "If the challenger demonstrates that the statute 'prohibits a substantial amount of protected speech 'relative to its 'plainly legitimate sweep,' then society's interest in free expression outweighs its interest in the statute's lawful applications, and a court will hold the law facially invalid." *Hansen*, 599 U.S. at 770 (citations omitted).

Invalidation for overbreadth provides "strong medicine" that should not be "casually employed." *Williams*, 553 U.S. at 293. To justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep. *New York State Club Assn., Inc. v. City of New York*, 487 U.S. 1, 14 (1988). The U.S. Supreme Court rejected an overbreadth challenge to an amendment to New York City's Human Rights Law that prohibited discrimination based on race, religion, or gender and its application to private institutions and clubs. *Id.* The plaintiffs had failed to identify those clubs for whom the antidiscrimination provisions would impair their ability to associate or to advocate public or private viewpoints. *Id.* The U.S. Supreme Court declined to conclude that the amendment threatened to undermine the associational

or expressive purposes of any club, let alone a substantial number of clubs. *Id.*
"[W]hatever overbreadth may exist should be cured through case-by-case analysis
of the fact situations to which its sanctions, assertedly, may not be applied." *Id.*; *see
also Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S.
789, 800-01 (1984) (rejecting a First Amendment challenge to a Los Angeles
Municipal Code that prohibited the posting of all signs, including political campaign
signs, on public property).

### 1.  HB 892's legitimate sweep.

The Montana Legislature appears chiefly to have been concerned with
prohibiting double voting when it crafted HB 892. Representative Lynn Hellegaard
described HB 892 as "clarify[ing] what double voting means in Montana law and
that voting in Montana and another state is defined as [voting in] the same election."
(Doc. 12-3 at 4-5.) Representative Hellegaard detailed the motivation behind passing
HB 892 as follows: "Voting twice has generally been one of those why bother crimes
that are rarely prosecuted. This bill will send a strong message. This type of illegal
behavior and manipulation of the electoral franchise will not be tolerated." (Doc. 13-
4 at 5.) Representative Hellegaard repeatedly described the genesis for HB 892 as
addressing "a recent court ruling in Arizona, which decided an individual could vote
in a midterm election in Arizona and Colorado because the election did [not] have
mutual candidates." (Doc. 13-5 at 3.) The Court further recognizes that HB 892 was

titled "An Act Revising Voting Limits Prohibiting Double Voting" when it was introduced on the Montana House of Representatives Floor. (*Id.* at 3.)

The Court notes that Defendants cite to *Northeast Ohio Coal. for Homeless v. Larose*, 2024 WL 83036 (N.D. Ohio January 8, 2024), for the proposition that a state possesses a legitimate interest in preventing voter fraud and promoting public confidence in the integrity of elections. (Doc. 49 at 2-3.) The Court agrees. The laws in Ohio addressed issues at the heart of election administration: appropriate photo IDs for voters, early mail-ballot deadlines, the elimination of in-person Monday before Election Day voting, drop box rules, and provisional ballot curing methods. *Northeast Ohio Coal.*, 2024 WL 83036 at *1-2. The Court recognizes, however, that the Ohio law at issue in *Northeast Ohio Coal* proves distinguishable from HB 892's multiple registration prohibition and prior registration disclosure requirement. The Court determines that the legitimate sweep of HB 892 is the prohibition of double voting. The Court's inquiry does not end there.

### 2.  HB 892's substantial applications.

The multiple registration prohibition and prior registration disclosure requirements both implicate voter registration beyond HB 892's prohibition of double voting. Courts in the Ninth Circuit have recognized that "voter registration is speech protected by the First Amendment." *Preminger v. Peake*, 552 F.3d 757, 765 (9th Cir. 2008). Montana must comply with concerns related to overbreadth in

choosing to regulate First Amendment activity. The Ninth Circuit's analysis in *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 944 (9th Cir. 2011), provides a useful example.

*Comite de Jornaleros de Redondo Beach* concerned a First Amendment challenge against a city ordinance that prohibited the solicitation of business, employment, or financial contributions on streets and highways. 657 F.3d at 940. The ordinance regulated both solicitation conduct and solicitation speech. The Ninth Circuit recognized that the ordinance applied to more than an actual physical exchange as the ordinance broadly defined "solicitation" as "[t]he act or an instance of requesting or seeking to obtain something; a request or petition." *Id.* at 946 (quoting Black's Law Dictionary 1520 (9th ed. 2009)). As written, the ordinance applied both to those who "solicit" or who "attempt to solicit," and it extends to the solicitation of "employment" and "business," not just "contributions." *Comite de Jornaleros de Redondo Beach*, 657 F.3d at 946. The ordinance's prohibition on the solicitation and attempted solicitation of employment and business applied to speech in addition to conduct. *Id.*

The Ninth Circuit identified several "obvious examples" of prohibited speech that do not cause the types of problems that motivated the ordinance, including "children selling lemonade on the sidewalk in front of their home" and "Girl Scouts selling cookies on the sidewalk outside of their school." *Id.* at 948. The significantly

21

overinclusive nature of the ordinance demonstrated its lack of narrow tailoring. *Id.* at 949 (*citing Watchtower Bible v. Village of Stratton*, 536 U.S. 150, 168 (2002)) (holding a permit requirement for all door-to-door solicitation to be "not tailored to the Village's stated interests" because "[e]ven if the interest in preventing fraud could adequately support the ordinance insofar as it applies to commercial transactions and the solicitation of funds, that interest provides no support for its application to petitioners, to political campaigns, or to enlisting support for unpopular causes").

The Ninth Circuit also took issue with the sweeping way the ordinance applied to all streets and sidewalks in the city when the city had introduced evidence of traffic problems only with respect to a small number of major streets and medians. *Comite de Jornaleros de Redondo Beach*, 657 F.3d at 949. The ordinance burdened substantially more solicitation speech than reasonably necessary to achieve its purpose by applying it citywide to all streets, alleys, and sidewalk. *Id.* (*citing Schneider v. New Jersey*, 308 U.S. 147, 163 (1939)) (invalidating anti-handbilling ordinances even though "their operation is limited to streets and alleys and leaves persons free to distribute printed matter in other public places"). The Ninth Circuit deemed the ordinance facially invalid as it "suppress[ed] a great quantity of speech that does not cause the evils that it seeks to eliminate." *Comite de Jornaleros de Redondo Beach*, 657 F.3d at 950 (quoting *Ward*, 491 U.S. 781, 799 n. 7.)

With these overbreadth principles in mind, the Court turns to HB 892's prohibition on multiple voter registrations. The Seventh Circuit analyzed a different, yet related, law concerning voter registrations in *Common Cause Ind. v. Lawson*, 937 F.3d 944, 960 (7th Cir. 2019). Indiana enacted a law to cleanse its voter rolls of people it suspected no longer qualified to vote there. The Indiana law allowed the state immediately to remove a voter based on information received from a third-party database rather than in response to direct contact with the voter. *Id.* at 946. The plaintiffs argued that Congress had enacted the National Voter Registration Act ("NVRA"), 52 U.S.C. §§ 20501–11, "to ensure that accurate and current voter registration rolls are maintained," among other purposes. *Id.* at 947. Congress sought to balance two competing concerns: "on the one hand, the need to ensure the integrity of the electoral process, §§ 20501(b)(3)-(4); and on the other hand, the need to increase voter registration and enhance voter participation, §§ 20501(b)(1)–(2)." *Common Cause Ind.*, 937 F.3d at 947.

The NVRA allows a state to remove the name of a registrant from its rolls if it takes that action "at the request of the registrant . . .." § 20507(a)(3). Indiana contended that the "registrant's act of registering to vote in another State must be understood as a written request to remove that person's name from the rolls in the previous State of residence." *Common Cause Ind.*, 937 F.3d at 960. The Seventh Circuit understood the ordinary meaning of "remov[al] . . . at the request of the

23

registrant" occurs when the *registrant* requests removal. *Id.* The Seventh Circuit rejected Indiana's claims that it could draw "an inference from information provided by [a third-party database] indicating that a voter has registered in another jurisdiction." This inference suffered from two fatal defects: the inference "is neither a request for removal nor is it from the registrant, as required under the terms of § 20507(a)(3)." The NVRA required more when such an inference represents "only an action that allows an inference that the voter is relinquishing her Indiana domicile." *Common Cause Ind.*, 937 F.3d at 960.

The Seventh Circuit raised several circumstances in which the inference might be rebuttable. These circumstances could apply to HB 892. For example, a person might move to Kansas from Indiana to take a new job, and upon arrival in Kansas immediately register to vote in Kansas. A change in her personal circumstances happens before Election Day, such as flunking a probationary period on the job, a family member becoming sick, or a better opportunity arising in Indiana. These changed circumstances might lead the person to return to her former residence in Indiana. *Common Cause Ind.*, 937 F.3d at 960. It may be perfectly rational in states that have an early registration deadline for a voter to register in a new location before getting around to canceling the old Indiana registration, selling an Indiana house, or severing other formal connections with Indiana. *Id.* Every year millions of Americans go off to college in August. Some drop out by November for academic,

financial, or other reasons, and land back on their parents' doorsteps. They will vote in only one place, even if they have open registrations in two. The only way to know whether voters want to cancel their registration is to ask them. *Id.*

The Seventh Circuit rejected Indiana's reliance on the criminalization of double voting to support its argument that registering to vote in a new jurisdiction implied that the voter no longer wanted to be registered in their old jurisdiction. Indiana equated double registration with double voting. The Seventh Circuit acknowledged the fundamental distinction between the two circumstances: "[w]hile double voting is surely illegal, having two open voter registrations is a different issue entirely. In the over-whelming majority of states, it is not illegal to be registered to vote in two places." *Common Cause Ind.*, 937 F.3d at 960.

The Court determines that Plaintiffs have raised substantial questions as to whether HB 892's multiple registration prohibition and prior registration disclosure requirements will substantially chill the protected activity of voter registration. Overbroad laws "may deter or 'chill' constitutionally protected speech." *Hansen*, 599 U.S. at 770 (quoting *Hicks*, 539 U.S. at 119). Defendants describe HB 892's multiple registration prohibition and prior registration disclosure requirements as permissible prophylactics guarding against double voting. (Doc. 30 at 25.) The Court disagrees. Defendants fail to draw a sufficient connection between maintaining multiple voter registrations and prohibiting double voting. The Court agrees with

Plaintiffs that HB 892's multiple registration prohibition and prior registration disclosure requirement tend to burden protected political activity through the imposition of felony criminal penalties, even when a registrant does not double vote or has no intention of double voting. (Doc. 33 at 9.)

"If the First Amendment means anything, it means that regulating speech must be a last—not first—resort." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373, (2002). Plaintiffs assert that HB 892's multiple registration prohibition and prior registration disclosure requirement substantially impact a large class of "highly transient voters," including "[c]ollege students, young people, and voters who temporarily relocate for job reasons . . .." (Doc. 12 at 30.) The Court views Plaintiffs' argument as rising above mere speculation or hypotheticals. Plaintiffs' allegations rise to the level of "instances of arguable overbreadth" as required for relief by the Ninth Circuit. *Comite de Jornaleros de Redondo Beach*, 657 F.3d at 944. The Court determines, at minimum, that Plaintiffs have raised substantial questions going to the merits of HB 892's multiple registration prohibition and prior registration disclosure requirements. *All. for the Wild Rockies*, 632 F.3d at 1134. Plaintiffs have demonstrated a likelihood of success on the merits concerning their overbreadth claim. *Winter*, 555 U.S. at 20. This factor tips in favor of Plaintiffs.

### b. Likelihood of irreparable harm in the absence of preliminary relief.

A plaintiff seeking a preliminary injunction must demonstrate that irreparable injury proves likely in the absence of an injunction. *Winter*, 555 U.S. at 22. A party seeking a preliminary injunction must show a sufficient causal connection between the alleged injury and the conduct sought to be enjoined. *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 982 (9th Cir. 2011).

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" for purposes of the issuance of a preliminary injunction. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). A preliminary injunction may not be granted, however, based only on a possibility of irreparable harm. *Winter*, 555 U.S. at 22. The party moving for a preliminary injunction bears the burden of demonstrating "immediate threatened harm." *Caribbean Marine Services Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).

Plaintiffs contend that they will suffer irreparable harm from HB 892's multiple registration prohibition and prior registration disclosure requirement because these laws will chill Plaintiffs' voter registration activities. (Doc. 12 at 34.) The Court agrees. Plaintiffs appear to face a proverbial Hobson's choice: attempt to conform their voter registration activities to HB 892; or cease or greatly reduce their voter registration activities for the 2024 Montana primary election and 2024 Montana general election. Plaintiffs, should they choose to continue their voter registration activities in the face of HB 892, may subject those they register to felony

criminal penalties under HB 892 either by violating the multiple voter registration prohibition or by violating the prior registration disclosure requirement.

Defendants contend that Plaintiffs have not suffered irreparable harm because Plaintiffs waited more than 160 days from the date when the Montana Legislature enacted HB 892 to seek preliminary relief. (Doc. 30 at 32.) A delay in seeking injunctive relief cuts against a party's claim that it will suffer irreparable harm absent injunctive relief. *See Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985); *see also Valeo Intell. Prop., Inc. v. Data Depth Corp.*, 368 F. Supp. 2d 1121, 1128 (W.D. Wash. 2005). The Ninth Circuit has recognized, however, that "delay is but a single factor to consider in evaluating irreparable injury; indeed, courts are loath to withhold relief solely on that ground." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019) (citation omitted). The Ninth Circuit in *Cuviello* determined that the plaintiff's delay in seeking relief from a 1997 law until 2015 did not defeat a claim of irreparable harm when the plaintiff had sought relief immediately after having become aware of the law at issue and its restriction of speech in June 2015. 944 F.3d at 822. The Ninth Circuit reasoned that "each instance in which [the plaintiff] restrained his own speech contributed to the constitutional injury he suffered. He continued to protest after learning he would need a permit, but altered his behavior in response to the requirement." *Id.* at 833.

The Montana Legislature passed HB 892 on May 2, 2023. *See* Montana Legislature, "HB 892," https://laws.leg.mt.gov/legprd/LAW0203W$BSRV.ActionQuery?P_SESS=20231 &P_BLTP_BILL_TYP_CD=HB&P_BILL_NO=892&P_BILL_DFT_NO=&P_C HPT_NO=&Z_ACTION=Find&P_ENTY_ID_SEQ2=&P_SBJT_SBJ_CD=&P_E NTY_ID_SEQ= (last visited April 24, 2023.) Montana's Governor signed HB 892 into law on May 22, 2023. *Id.* No presidential primary or presidential general election has taken place since HB 892 was enacted. Plaintiffs' delay does not undercut their claim that they have been irreparably harmed due to HB 892's multiple registration prohibition and prior registration disclosure requirement. Plaintiffs' overbreadth claim further supports the Court's determination. When First Amendment rights are "being chilled daily, the need for immediate injunctive relief without further delay is, in fact, a direct corollary of the matter's great importance." *Sanders Cty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 748 (9th Cir. 2012). The Court determines that the likelihood of irreparable harm tips in favor of Plaintiffs.

### c. Balance of equities.

The party moving for injunctive relief bears the burden of establishing that "the balance of equities tips in [their] favor." *Winter*, 555 U.S. at 22**.** A court must "balance the interests of all parties and weigh the damage to each" in assessing

29

whether this burden has been met. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138

(9th Cir. 2009). "Courts must also pay particular attention to the public consequences

of employing the extraordinary remedy of injunction." *Native Ecosystems Council*

*v. Mehlhoff*, No. CV 20-19-BLG-SPW-TJC, 2020 WL 3969343, at *7 (D. Mont.

July 6, 2020), report and recommendation adopted, No. CV 20-19-BLG-SPW, 2020

WL 4260515 (D. Mont. July 24, 2020) (internal citation and quotation omitted.)

Plaintiffs argue that equity tips in their favor because they face substantial

financial and organizational damage if the Court fails to enjoin HB 892's multiple

registration prohibition and prior registration disclosure requirement. (Doc. 33 at

19.) Plaintiffs also assert that the constitutional right of voters to register faces injury

from the enforcement of HB 892. (Doc. 12 at 27.) The Court agrees that Plaintiffs

sufficiently alleged that they face substantial financial and organizational hardship

related to having to conform their voter registration activities to HB 892's

requirements. Plaintiffs' voter registration activities demonstrate a sufficient nexus

to the protected First Amendment activity of voter registration. *See Peake*, 552 F.3d

at 765. The Court recognizes further the public's "strong interest in exercising the

'fundamental political right' to vote," and that fundamental right's intrinsic

relationship to Plaintiffs' voter registration activities. *See Obama for Am. v. Husted*,

697 F.3d 423, 436–37 (6th Cir. 2012) (quoting *Purcell*, 549 U.S. at 4.)

Defendants assert that the balance of equities tip in their favor because of their interest in the preservation of the statute as a reflection of the will of the people of Montana. (Doc. 30 at 34-35.) Defendants' argument proves unpersuasive. Plettenberg, the Ravalli County Clerk and Record Election Administrator and chairperson for the Montana Association of Clerk and Recorder's legislative committee, testified that the County Clerks were advised by the Montana Secretary of State's office that "[HB 892] wouldn't change any of our [election workers] – the current practice we were following before." (Doc. 63 at 116.) Plettenberg further commented that it was her understanding that, following HB 892's enactment, being registered in multiple places would not amount to criminal activity. (*Id.* at 113.) Plettenberg testified regarding the prior registration disclosure requirement that the county recorders "would not police that." (*Id.* at 114.) Defendants will suffer no harm if they are enjoined from enforcing an action that they would otherwise not take. *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (district court did not err in determining that the balance of equities favored the plaintiff where the governmental defendant did not seek to enforce Arizona law permitting the detention of individuals based only on immigration status.) The balance of equities tips in favor of Plaintiffs.

### d. Injunction in the public interest.

The public interest inquiry generally considers the impact of granting or withholding injunctive relief upon nonparties. *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). Courts must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Stormans, Inc.*, 586 F.3d at 1139 (quoting *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312–13 (1982)).

The public interest supports the issuance of an injunction against HB 892's multiple registration prohibition and prior registration disclosure requirement. "It is beyond cavil that voting is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (citation omitted.) The public maintains a strong interest in "exercising the fundamental political right to vote." *Obama for Am.,* 697 F.3d at 436–37(quotation omitted). The ability of Montana voters to register to vote without fear of felony criminal penalties appears to substantially implicate the public's interest in protecting the franchise. Plaintiffs' voter registration activities serve as a method by which many eligible Montanans register to vote, thereby enabling them to exercise their right to the franchise. (*See* Doc. 12-1 at 4 ("In 2020, MontPIRG volunteers and interns registered 5,612 voters across the state . . .")); (Doc. 12-2 at 4 ("[B]etween November 2018 and November 2020, at least 2,978 MFPE members changed their

32

voter registration address. Of these, nearly 1,000 were first-time Montana registrants.”))

The Court remains mindful that a countervailing public interest exists in preventing “chaotic and disruptive effect[s] upon the electoral process.” *Benisek v. Lamone*, 585 U.S. 155, 161 (2018) (quoting *Fishman v. Schaffer*, 429 U.S. 1325, 1330 (1976)). The Court finds that the public interest in preventing disputations in the electoral process will not be implicated by enjoining HB 892’s multiple registration prohibition and prior registration disclosure requirement. The Montana Secretary of State’s office advised Plettenberg and other county recorders responsible for administering election proceedings and maintaining voter rolls that HB 892 “wouldn’t change any of our [election workers] – the current practice we were following before.” (Doc. 63 at 116.) The Court determines that limited injunctive relief likely will not significantly impact election procedures in Montana that appear to be unchanged by HB 892. The public interest tips in favor of Plaintiffs.

## ORDER

Accordingly, **IT IS ORDERED:**

1. Plaintiffs’ motion for a preliminary injunction (Doc. 11) is **GRANTED**.

2. Defendants, their agents, and their successors are enjoined from enforcing HB 892’s multiple registration prohibition and prior registration disclosure requirement provisions codified in Mont. Code. Ann. § 13-35-210(5).

33

3. All other provisions of HB 892, codified in Mont. Code. Ann. § 13-35-210, shall remain in effect. The Court's injunction applies only to Mont. Code. Ann. § 13-35-210(5).

4. The Court's injunction shall remain in effect until this action has been adjudicated on the merits.

DATED this 24th day of April 2024.


_____
Brian Morris, Chief District Judge
United States District Court